**GRASLE ELECTRIC COMPANY,
Appellant,**

v.

**Rudolph Frank CLARK and Geraldine
Aea Clark, Appellees.**

**No. 2073.**

Supreme Court of Alaska.

Aug. 26, 1974.

Howard Staley, Merdes, Schaible, Staley & DeLisio, Fairbanks, for appellant.

Millard F. Ingraham, Ingraham & Niewohner, Fairbanks, for appellees.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, Justices.

OPINION

BOOCHEVER, Justice.

A pickup truck driven by an employee of Grasle Electric Company collided with an automobile driven by Rudolph Clark, in which his wife Geraldine was a passenger in October 1971. The Clarks filed this action for damages against Grasle Electric

Company (hereinafter "Grasle"), and liability was established by summary judgment from which no appeal was taken. This appeal attacks as excessive the amount awarded the Clarks by the jury in the trial on damages, and raises several alleged errors in the conduct of the trial, the instructions to the jury, and the award of attorney's fees.

The parties stipulated to damages of $4,421.80 for medical expenses, lost earnings and damage to the Clark's automobile. The jury ultimately returned verdicts of $83,244.50 in favor of Rudolph and $44,018.30 in favor of Geraldine. Alleging the same errors now pressed on appeal, Grasle filed a motion for a new trial in the superior court. The superior court denied the motion, entered judgment on the verdict and awarded attorney's fees according to the schedule set out in Civil Rule 82. Grasle appeals.

## EXCESSIVE DAMAGES

Grasle contends that the verdicts were excessive, and that the trial judge should have ordered a new trial. In Fruit v. Schreiner,[1] we said that:

we shall not set aside an award on a claim of excessiveness unless it is so large as to strike us that it is manifestly unjust, such as being the result of passion or prejudice or a disregard of the evidence or rules of law.

In applying the Fruit v. Schreiner test, we must "view the evidence and all inferences reasonably deducible therefrom in the light most favorable"[2] to the Clarks. The evidence at trial demonstrated that Geraldine incurred significant low back and neck disabilities.[3] Rudolph suffered a permanent low back disability, a frightening episode of hysterical blindness,[4] total impotence and deformity of his genital organs. The Clarks' marriage has been shattered. Nowhere in its brief does Grasle maintain that the awards to the Clarks are excessive if it is established that all the injuries are related to the accident. Rather, appellant's entire argument is based on the contention that the jury disregarded the evidence in finding the impotence, genital deformity and marital problem related to the accident.

Testimony at trial indicated that, although Rudolph experienced occasional sexual problems and there were some marital tensions, the parties enjoyed a reasonable marriage relationship for some 13 years before the accident. Both of the Clarks testified that the total impotence commenced immediately after the accident, caused marital tension and that Rudolph experienced a post-accident personality change which manifested itself in violent, destructive tantrums directed at Geraldine. Dr. Whelan, the Clarks' treating psychiatrist, advised the Clarks to separate because he was afraid that one would use deadly or maiming force on the other. At the time he recommended the separation and at trial, he believed the discord was directly impotence-related. At trial, Dr. Whelan stated that, to a reasonable medical certainty, the accident either caused the impotence or qualitatively and quantitatively aggravated a pre-existing condition, and

1. 502 P.2d 133, 145 (Alaska 1972), adopting the court-trial standard of Beaulieu v. Elliott, 434 P.2d 665, 676 (Alaska 1967), for jury-trial awards, and recently followed in City of Fairbanks v. Smith, 525 P.2d 1095 (Alaska 1974).

2. City of Fairbanks v. Smith, 525 P.2d at 1095 n. 1 and accompany text (Alaska 1974).

3. This disability may have been psychosomatic to some degree, but even the defendant's expert witness believed that Geraldine actually suffered the symptoms she described and was not malingering. A psychosomatic illness, as the term was used by the experts at trial, is experienced by the patient as a physiogenic disease; in no sense does it involve conscious fabrication.

4. "Hysterical blindness" is a condition which causes one to be sightless although there is no defect in the eye or ocular nerves. The condition is perceived as real blindness by the victim. The physician who treated Clark performed several tests to assure that no fakery was involved. The condition was cured by counseling.

the impotence was a major factor in the marital discord. No defense witness challenged the Clarks' testimony; no defense expert sought to refute Whelan's diagnosis.[5]

Grasle presses a three-pronged attack upon the verdict. Its first and most vigorously–contended element is that the entirety of the Clarks' testimony should be disregarded because their treating psychiatrist diagnosed them to be hysterical personalities, prone to exaggeration. "Hysteria" as used at the trial is a psychiatric term of art which does not refer to the layman's concept of uncontrollable crying, laughter or the like. Although there is no complete definition of "hysterical personality" in the testimony, a number of tendencies were brought out: immaturity; overdramatization, excitability, and exaggeration; psychosomatic illness; overdependency on others; sexual inadequacies; failure to listen to others; and memory difficulties.

From this melange of unfortunate traits, Grasle has seized upon the tendency to exaggerate as the minor premise of a syllogism which leads to the total rejection of the Clarks' testimony. The unstated major premise of the argument, that witnesses may exhibit character traits which make them "inherently unreliable", has been rejected by this court.[6] Taking Grasle's argument to apply to specific testimony, we have held that the assessment of credibility is "exclusively within the province of the jury" in rejecting a contention that certain testimony was so incredible that it should have been rejected as a matter of law.[7] We adhere to that position here.

Grasle next contends that the evidence demonstrated that all the Clarks' problems antedated the accident. Initial evidentiary support for this contention is sought in a statement by Mrs. Clark to the treating psychiatrist that Rudolph and the state of the marriage were "pretty much unchanged". Grasle assumes that the statement indicates a lack of change from the time before to the time after the accident. The record plainly demonstrates that the relevant time context was from the breakup of the marriage until the time of trial, when the Clarks attempted reconciliation. Far from being an admission of pre-existing difficulties, the statement evinces the duration of the marital problems. Grasle also presses here the same argument made to the jury that the testimony demonstrates pre-accident impotence in Rudolph. Rudolph admitted to minor sexual difficulties before the accident, and the jury must have believed the testimony of Dr. Whelan that Rudolph's condition after the accident was qualitatively and quantitatively different from that before the accident, and that Rudolph suffered physical atrophy of his genital organs. Grasle also seeks to show that Dr. Whelan was unable to conclude what caused Rudolph's impotence. The testimony which bolsters that argument was fully explained elsewhere; Dr. Whelan could not determine conclusively whether the impotence

---

5. *See* note 10 *infra.*

6. Fields v. State, 487 P.2d 831, 844 (Alaska 1971).

7. Anthony v. State, 521 P.2d 486, 492 (Alaska 1974); Nordin v. City of Nome, 489 P.2d 455, 464 (Alaska 1971). *Cf.* Paskvan v. Mesich, 455 P.2d 229, 239 (Alaska 1969). The testimony at trial indicated that the exaggerations to which hysterics are prone constitute uncontrollable misperceptions or alterations of reality, not conscious fabrications. A number of exaggerated statements by Rudolph Clark were pointed out to the jury during the course of trial: overdramatization

of a prior accident; overstatement of pre-accident sexual prowess; overdramatization of the automobile crash which led to this litigation. Both of the Clarks probably overstated the degree of marital harmony which existed before the accident. Mrs. Clark may have overdramatized an episode of hysterical blindness which Rudolph suffered after the accident, but her testimony is much more indicative of an inability to listen to and respond directly to questions of counsel and an inability to recall names and dates. All of these weaknesses in the Clarks' testimony were vividly explored by Grasle's trial counsel in closing argument.

was caused by nerve damage or psychological factors, but in either case he found to a medical certainty that the total impotence was caused by the accident. The testimony was sufficient to create a jury issue regarding the cause of Rudolph's impotence.[8]

The final prong of Grasle's attack upon the verdict summarizes all of the inconsistencies and minor defects in the testimony and suggests that the verdict was contrary to the weight of the evidence. In United Bonding Insurance Co. v. Castle,[9] we articulated the standard we apply to such contentions:

> To hold that the verdict was contrary to the weight of the evidence is equivalent to saying that under the evidence the jury could not reasonably have decided as they did. To reach such a conclusion it would have to appear that evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust.

We deal here with a trial limited to quantifying damages. Neither the stipulated damages nor the orthopedic injuries are contested on appeal. Regarding the impotence and marital breakup, a consistent picture emerges from the trial. Before the accident the Clarks engaged in normal social and recreational relationships with others, who perceived no marital discord. The treating psychiatrist testified that the Clarks were maritally well-adjusted prior

to the accident, especially when one considered their personality weaknesses. The accident caused injuries to both Clarks. Rudolph experienced extreme pain, an episode of hysterical blindness, loss of all sexual function and an altered personality. Ultimately, the marital relationship was destroyed. The Clarks' testimony and that of Dr. Whelan was sufficient to establish causal relationship between each element of damage and the accident. No defense expert directly refuted Dr. Whelan,[10] and no defense expert expressed a belief that either of the Clarks was lying or malingering. We cannot say that the evidence to support the verdict was so slight or unconvincing that the verdict is plainly unreasonable or unjust.

## ALLEGED TRIAL ERRORS

■ Grasle assigns as error the trial court's restriction of the cross-examination of Dr. Whelan by Grasle's trial counsel. The court foreclosed [11] but a single hypothetical question. We agree with the trial court that the question was cumulative at best. As formulated, the question was likely to confuse or mislead both the witness and the jury. The question was withdrawn by counsel, who made no effort to rephrase or reformulate the question. Throughout the trial, the court afforded Grasle's counsel wide latitude in cross-examining both expert and lay witnesses. There was no error.[12]

---

**8.** *See* Armstrong v. State, 502 P.2d 440, 445–446 (Alaska 1972).

**9.** 444 P.2d 454, 455 (Alaska 1968).

**10.** Two orthopedists agreed that impotence is rarely related to back injuries except those which involve severe damage to the spinal column. The deposition of a urologist who examined Rudolph Clark for the purposes of this litigation was read to the jury but was not made a part of the record on appeal. Grasle's brief indicates that the urologist diagnosed psychogenic impotence. The issue at trial was not the precise medical etiology of the impotence, but whether the automobile accident was its legal cause. Neither the orthopedic testimony, which verged on the

speculative, nor the urologist's deposition controverts the diagnosis of psychogenic impotence caused by the accident, nor do they conclusively refute physiogenic impotence similarly caused.

**11.** The court neither formally sustained nor denied the objection; the discussion presaged sustaining the objection at least in part when Grasle's counsel withdrew the question. Since we find that the trial court properly could have sustained the objection, we shall not consider whether Grasle waived the right to object.

**12.** Burgess Constr. Co. v. Hancock, 514 P.2d 236, 237 (Alaska 1973); *see* Rider v. Rider,

■ Grasle contends that the trial court erred in giving instruction ten to the jury because it unduly repeated instruction nine. Both instructions covered damages for loss of consortium. Although instruction ten might have been drafted more carefully, it is clear that instruction nine defined "consortium damages", and instruction ten informed the jury how to evaluate in dollars the nebulous concepts of "society, companionship and conjugal relationship". As such, the pair of consortium instructions forms a shorter unit than instruction six (pain and suffering) or instruction seven (general damages), both of which followed the same definition-and-quantification format as instructions nine and ten. Grasle does not contend that either instruction nine or instruction ten misstated the law. We cannot find error in the mere splitting of permissible material into two instructions.

■ At trial Grasle's counsel questioned Rudolph Clark about statements he made in a 1961 medical form which were inconsistent with his trial testimony regarding the number of times the Clarks had sexual intercourse and regarding an infection of his genital organs. Clark admitted that he had filled out the form in his own handwriting; the statements were read to the jury and Clark admitted making them. Later Grasle's counsel sought to have the medical document itself submitted to the jury. No additional information relevant to the case was contained in the document, as Grasle admitted at trial and concedes again on appeal. The sole reason for the admission of the document was "Simply placing it before the jury, Your Honor." The trial court refused to admit the document and Grasle appeals. The trial court did not abuse its discretion in refusing to admit the writing.[13]

In response to Grasle's contention that the trial court unfairly interjected comments prejudicial to Grasle's case during the course of trial, we have reviewed the transcript and found no error. Grasle has cited four allegedly prejudicial comments in the course of a four-day trial. The two which were made *sua sponte* reflected no prejudice whatever upon Grasle's case, but merely expedited the admission of evidence.[14] The other comments were made during argument upon specific objections by the Clarks' counsel to questions asked by Grasle's counsel. During one extended colloquy the trial court properly restricted the solicitation of speculative testimony. We find nothing in that exchange unfair to Grasle, its counsel or its case. The other comments occurred in the discussion of the hypothetical question asked of Dr. Whelan, which we have already held to have been within the court's discretion to foreclose. Again, nothing in the court's statement was unfair.

## ATTORNEY'S FEES

■■ The trial court awarded Rudolph $10,118.87 and Mrs. Clark $5,751.24 attorney's fees, based entirely upon the schedule

493 P.2d 679, 680 (Colo.App.1972) ; Simpson v. State, 32 Wis.2d 195, 145 N.W.2d 206, 211–212 (1966).

13. Patterson v. Cushman, 394 P.2d 657, 660–661 (Alaska 1964). Grasle appears to contend that the writing should have been admitted because Rudolph did not admit its truth, *citing* 58 Am.Jur. [Witnesses § 780] 430. The question is not whether Rudolph admitted or denied the truth of the statements, but whether he admitted making them. Once he admitted making the statements, he was entitled to agree or disagree with them

or explain away the inconsistency. The section cited by Grasle states unequivocally: "If [the witness] *admits that he made* the statements in question, there is no necessity for proving them and they are not admissible in evidence" [emphasis added]. But *cf.* Bentley v. State, 397 P.2d 976, 979 (Alaska 1965), which casts some doubt on *Patterson* in criminal cases.

14. The trial court simplified the introduction of a prior inconsistent statement by avoiding the reading of an oath on the document which contained the statement and corrected counsel's use of medical texts in impeachment.

set out in Civil Rule 82(a)(1).[15] Grasle appeals, contending that the awards were excessive and an abuse of discretion. We have repeatedly held that the award of attorney's fees is vested in the sound discretion of the trial court. We will interfere with that discretion only when it is abused by the making of a manifestly unreasonable award.[16] The trial of this case lasted four full days, the jury returning on the morning of the fifth. Liability was established by summary judgment after the taking of depositions. To say that the trial was a simple resolution of damage issues is to understate grossly the preparation required for the complicated medical and psychiatric issues involved. The trial court took into account the unique issues raised by the case, found that both counsel engaged in more extensive preparation than in ordinary automobile litigation trials, noted that defense counsel himself had commented upon the complication of the case and the effort required to prepare it and found that a Rule 82(a)(1) award was the best port in a sea of uncertainty. We have at least twice affirmed awards of larger sums for attorney's fees, based upon Civil Rule 82(a)(1), where the cases were not demonstrably more difficult to prepare or try than the Clarks'.[17] The trial court did not abuse its discretion in resorting to Civil Rule 82(a)(1) to award attorney's fees.

Finding no error, we affirm the judgment of the superior court.

15. Civil Rule 82(a)(1) provides:

(a) Allowance to Prevailing Party as Costs.

(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

### Attorney's Fees In Average Cases

|  |  | Contested | Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $2,000 | 25% | 20% | 15% |
| Next | $3,000 | 20% | 15% | 12.5% |
| Next | $5,000 | 15% | 12.5% | 10% |
| Over | $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

———◆———

16. Cooper v. Carlson, 511 P.2d 1305, 1309–10 n. 6 (Alaska 1973); Hodges v. Mock, 501 P.2d 1355, 1360 (Alaska 1972); Owen Jones & Sons, Inc. v. C. R. Lewis Co., 497 P.2d 312, 314 (Alaska 1972); Palfy v. Rice, 473 P.2d 606, 613 (Alaska 1970); McDonough v. Lee, 420 P.2d 459, 465 (Alaska 1966).

17. McDonough v. Lee, 420 P.2d at 464–465; see Weckman v. Houger, 464 P.2d 528 (Alaska 1970).