AMERICAN NATIONAL WATERMAT-
TRESS CORPORATION, Appellant and
Cross-Appellee,

v.

Florence E. MANVILLE, Appellee and
Cross-Appellant.

Nos. 4652, 4653.

Supreme Court of Alaska.

March 26, 1982.

Dennis M. Bump of Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellant and cross-appellee American Nat. Watermattress Corp.

Barbara L. Schuhmann of Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, for appellee and cross-appellant.

Before RABINOWITZ, C. J., CONNOR and BURKE, JJ., BRYNER, C. J. of the Court of Appeals, and SINGLETON, J. of the Court of Appeals.*

## OPINION

BURKE, Justice.

Florence Manville was injured when she was pinned beneath her waterbed after it rolled off its pedestal. The waterbed had

* Bryner and Singleton, Court of Appeals Judges, sitting by assignment made pursuant to article

IV, section 16 of the Constitution of Alaska.

been purchased from Jack Pendley, a retail dealer. The waterbed had been manufactured by American National Watermattress Corporation (ANWC).

Manville filed an action against ANWC and Pendley seeking the recovery of damages for her injuries. She sued on theories of negligence, breach of warranties, and strict liability.

Before trial, Pendley settled with Manville for $60,000. Manville then proceeded to trial against ANWC, the remaining defendant. The jury found for Manville and returned a verdict against ANWC of approximately $150,000, which, after adjustment by the trial judge for Pendley's settlement and plaintiff's negligence, resulted in a net money judgment of approximately $105,000, including costs and attorneys' fees. The jury also found that Pendley had a right to indemnity from ANWC for his settlement payment.

ANWC presently appeals from the final judgment, alleging various trial court errors in discovery and evidentiary rulings. In addition, ANWC attacks the sufficiency of the evidence to support the court's instruction to the jury on impaired earning capacity.

Manville has filed a cross-appeal in which she attacks the trial court's method of computation used in reducing the jury verdict against ANWC to allow for her earlier settlement with the other defendant, Pendley.

### Appeal

I. Should the trial court have ordered Manville to produce her interview with her attorneys' employee?

Within a few days after the accident, Manville contacted her present attorneys for legal advice. Since two of the firm's attorneys were then in trials, the firm sent its full-time employee, Chuck Ward, to interview Manville so that they "could provide her with legal advice and possible legal assistance in regard to that accident." It is undisputed that Ward was not an attorney.

Ward interviewed Manville in her hospital room and tape recorded a portion of his conversation with her. This tape recording was transcribed and delivered to the firm's attorneys. The firm subsequently accepted Manville's case.

During discovery, defendants ANWC and Pendley learned of the existence of Manville's statement and requested its production. Manville refused, claiming the document was privileged.

ANWC and Pendley then moved for an order to compel production of the statement, maintaining that as an eyewitness statement, it was not protected by either the attorney-client privilege or the attorney work product privilege. In its opposition to the motion, Manville made clear that she was not claiming the attorney work product privilege, but rather was relying solely on the attorney-client privilege. After oral argument, the trial court denied the motion.

■ On appeal, ANWC again asserts that Manville's statement was not protected by either the attorney-client or attorney work product privileges, and therefore, the trial court should have ordered its production. ANWC's claim that the court should have ordered the production of Manville's statement is without merit. Her statement is protected from discovery by the attorney-client privilege as a confidential communication from Manville to her attorneys through their agent.[1]

The trial in this case took place before the promulgation of the current Evidence

---

1. Since the attorney-client privilege applies, it protects the statement from all discovery processes. Alaska R.Civ.P. 26(b)(1); C. McCormick, Law of Evidence § 96, at 202 & n.65 (2d ed. 1972).

In addition, since we have decided that Manville's statement is protected by the attorney-client privilege, it is unnecessary for us to decide whether the attorney work product privilege also protected Manville's statement from discovery.

We also note that ANWC's contention that the automatic exemption of "eyewitness statements" from the attorney work product privilege, as discussed in *Van Alen v. Anchorage Ski Club, Inc.*, 536 P.2d 784, 788 (Alaska 1975); *Miller v. Harpster*, 392 P.2d 21, 23 (Alaska 1964), also applies to the attorney-client privilege is without merit. This exception applies only to the work product privilege, not the attorney-client privilege.

Rules which now govern privilege questions. *See* Alaska Rule of Evidence 501–512. Therefore, former Civil Rule 43(h)(2) provided the basis for the attorney-client privilege:

An attorney shall not, without the consent of his client, be examined as to any communication made by his client to him, nor as to the attorney's advice given thereon, in the course of the attorney's professional employment.

■ As this court has noted: "The purpose of the attorney-client privilege is to promote the freedom of consultation of legal advisors by clients by removing the apprehension of compelled disclosure by the legal advisors." *United Service Automobile Association v. Werley*, 526 P.2d 28, 31 (Alaska 1974). However, this desire to promote the consultation of attorneys through the use of the attorney-client privilege must be balanced against the need for the discovery of facts. As we have stated: "Given our commitment to liberal pre-trial discovery, it follows that the scope of the attorney-client privilege should be strictly construed in accordance with its purpose." *Id.*

This court has never directly ruled on the question of whether a statement of facts given by a prospective client to an attorney's agent is protected by the attorney-client privilege. For analysis, this issue may be more conveniently broken into three subissues.

A. Was Manville a "client" entitled to the protection of the attorney-client privilege, where she made the questioned communication in an attempt to obtain legal advice, but the attorney had not yet accepted her case?

While former Civil Rule 43(h)(2) and our own case law are silent on this issue, the statement of the attorney-client privilege embodied in the new Evidence Rules contains a clear answer which, although not in effect at the time of trial, is persuasive. Evidence Rule 503(a)(1) sets out the following definition of a "client" for the purposes of the attorney-client privilege: "A client is a person ... who is rendered professional legal services by a lawyer, or *who consults a lawyer with a view to obtaining professional legal services.*" (Emphasis added.)

The language of the above provision is further clarified in the Evidence Rules Commentary: "The definition of 'client' extends the status of client to one consulting a lawyer preliminarily with a view of retaining him, even though actual employment does not result." Alaska Rule of Evidence Commentary 503(a).

In addition, it is clearly the universal common-law rule that such "[c]ommunications in the course of preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted." C. McCormick, Law of Evidence § 88, at 179 (2d ed. 1972). *Accord*, 8 J. Wigmore, Evidence § 2304, at 587 (McNaughton rev. 1961); 81 Am.Jur.2d *Witnesses* § 180 (1976 & Supp.1980); 97 C.J.S. *Witnesses* § 278 (1957 & Supp.1980).

As stated by one court, the reason for such a rule is that "no person could ever safely consult an attorney for the first time with a view to his employment if the privilege depended on the chance of whether the attorney after hearing his statement of the facts decided to accept the employment or decline it." *In re Dupont's Estate*, 140 P.2d 866, 873 (Cal.App.1943); *accord, People v. Canfield*, 527 P.2d 633, 636–37 (Cal.1974).

In the present case, Manville was seeking an attorney to prosecute her case. The interview with her at the hospital was undertaken in order that the attorneys "could provide her with legal advice and possible legal assistance in regard to the accident." Therefore, Manville qualified as a "client" within the meaning of the attorney-client privilege.

B. Was Manville's statement protected by the attorney-client privilege where it was made to an employee of her attorney, rather than the attorney himself?

Again, former Civil Rule 43(h)(2) and Alaska case law do not address this issue. However, the attorney-client privilege set out in the new Evidence Rules provides an affirmative answer. Rule 503(b) sets out the general rule of privilege:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or *his lawyer's representative*, or (2) between his lawyer and *the lawyer's representative* . . . .

(Emphasis added.)

Rule 503(a)(4) provides a definition of "representative of a lawyer": "A representative of the lawyer is one employed to assist the lawyer in the rendition of professional legal services."

The Evidence Rules Commentary states: "The definition of 'representative of the lawyer' recognizes that the lawyer may, in rendering legal services, utilize the services of assistants *in addition to those employed in the process of communicating.*" Evidence Rules Commentary 503(a)(4) (emphasis added). This language clearly indicates that even in the absence of the "representative of the lawyer" language, the attorney-client privilege would protect confidential client communication to the attorney's employee who is used simply as a conduit for communication. This conforms to the dictates of the traditional common-law privilege.

Even the courts which took the strictest view of the common-law privilege held that it extended to laymen who are necessary intermediaries between attorney and client. 8 J. Wigmore, *supra*, § 2301, at 583 & n.1; C. McCormick, *supra*, § 89, at 182, § 91 at 188–89. *Accord, United States v. Kovel*, 296 F.2d 918, 920–23 (2d Cir. 1961); *City and County of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26, 30–31 (1951). See cases collected in: Annot., 96 A.L.R.2d 125, § 32–33, 147–48 (1964 & Supps.1976 & 1980); 81 Am.Jur.2d *Witnesses* §§ 179, 191, 217 (1976 & Supp.1980); 97 C.J.S. *Witnesses* §§ 276c(1), (2) (1957 & Supp.1980).

In the present case, Manville's communication to her attorneys' employee, Ward, would be protected by even the most restrictive interpretation of the common-law privilege. In this case, the investigator was an employee and agent of the attorney who was acting as a conduit for the transmission of information from the client to her attorney.

C. Is Manville's statement of the facts of the accident protected by the attorney-client privilege, where no legal points were discussed during the interview?

ANWC maintains that since no legal points were discussed in the hospital interview, only raw facts, the attorney-client privilege did not apply.

The language of both former Civil Rule 43(h)(2) and current Evidence Rule 503(b) refute ANWC's claim. The privilege under former Civil Rule 43(h)(2) included "any communication made by his client to him . . . *in the course of* the attorney's professional employment." (Emphasis added.) The current Evidence Rule 503(b) provides that "communications made for the purpose of *facilitating* the rendition of professional legal services to the client" are protected. (Emphasis added.) Neither of these formulations lend support to ANWC's contention that legal points must be discussed in order to make an attorney-client communication privileged. If the communication is either "in the course of" the attorney's professional employment or "facilitates" the rendition of legal services, it is protected.

In addition, the very heart of the common-law privilege was to protect the facts given by the client to his attorney. The privilege was based on the necessity that an attorney have the full disclosure of the *facts* from his client. The attorney-client privilege furthers this policy by protecting this statement of facts. C. McCormick, *supra*, § 87, at 175–76; 8 J. Wigmore, *supra*, § 2291, at 545–54. Indeed, the now generally recognized application of the privilege to communications from the lawyer to the client is but an extension of the original essence of the privilege as a protection of only the client's factual communications to his attorney. C. McCormick, *supra*, § 89, at 182–83.

In the present case, Manville related the facts of the waterbed accident to her attorney. Such a statement of facts is protected by the attorney-client privilege.

II. Did the trial court err in admitting evidence of ANWC's post-accident conduct?

At trial, Manville's attorneys read into the record parts of the deposition of Craig Miller, the president of ANWC. (Miller was not available to testify in person at the trial.) The following questions were among those read:

Q. After the Manville incident came to your attention, did you issue any warnings to your retailers?

A. There was no reason for it.

Q. So you did not issue any warnings?

A. No.

Q. Did you issue any recalls of the Aquapedic?

A. There was no reason for it.

Q. So you didn't issue any recalls?

A. No.

ANWC objected to this testimony as being irrelevant and prejudicial. The trial court overruled the objection and allowed the testimony to be read to the jury.

The theory of relevance offered by Manville was that the evidence was part of its punitive damages claim. Her contention was that ANWC's lack of post-accident remedy such as a warning or recall contributed to a showing of a pattern of callous and indifferent conduct towards that rights of others. For Manville to recover punitive damages, of course, she would have to show that that pattern extended to her.[2] If such conduct could be found to have been involved in ANWC's failure either to warn Manville of the risk of the harm that actually befell her or to recall her Aquapedic watermattress, then punitive damages would be appropriate. This is because the standard for awarding punitive damages in Alaska requires proof of "reckless indiffer-

ence" or "conscious action in deliberate disregard" of the rights of others. *Sturm, Ruger & Co. v. Day,* 594 P.2d 38, 46 (Alaska 1979); Restatement (Second) of Torts § 908 Comment b (1979).

At the point in the trial when this evidence was offered, it had already been shown that ANWC knew about the Aquapedic's leaking problem and had in fact already withdrawn it from production prior to the Manville accident. It had also been already shown that ANWC had issued no Aquapedic warnings prior to the Manville accident.

Manville's theory actually uses the evidence of specific conduct after the accident, ANWC's failure to warn or recall the Aquapedic, to establish what it calls a "pattern" of reckless and "callous disregard." That pattern is then supposed to be probative of the conduct ANWC exhibited in its failure to warn about or recall the Aquapedic before Manville's accident. The reasoning proceeds as follows: since ANWC was callous and recklessly indifferent after the accident, it is callous and recklessly indifferent in general; since ANWC is callous and recklessly indifferent in general, it was callous and recklessly indifferent before the accident. When Manville shows that she was victimized by such a state of mind, she is entitled to punitive damages.

There are two problems with this theory: First, there is a significant difference between the circumstances of ANWC's pre- and post-accident conduct. Failure to warn about or recall a watermattress with a mere leak problem does not rise to "callous and reckless disregard" until it becomes at least reasonably foreseeable that the leak could cause injury. Manville's painful ordeal provided sufficient demonstration of the peril encountered by a possessor of a leaky Aquapedic. However, there was no evidence before the court that would support the conclusion that ANWC was on notice of this risk *prior* to Manville's accident. Therefore, although the evidence of subsequent reckless disregard is logically rele-

---

**2.** In defining the general nature of punitive damages, the leading treatise says: "Punitive damages ... may be awarded to plaintiffs who prove *themselves* victims of a wilful, wanton, reckless, malicious, oppressive or brutal act." K. Redden, *Punitive Damages* § 2.1 (1980) (emphasis added).

vant towards proving ANWC's state of mind before the accident and thus admissible under Alaska Rule of Evidence 401, its probative value is substantially impaired because of the change in circumstances.

Second, Manville's "pattern of conduct" theory really amounts to an attempt to use character evidence to prove specific conduct. That is, Manville is claiming that ANWC's "pattern" of "callous and reckless disregard" tends to show how ANWC acted before the accident with regard to Manville. This use of character evidence is in violation of both Alaska Rule of Evidence 404(a) and (b) which provide in relevant part:

> (a) Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, . . .
>
> . . . .
>
> (b) Evidence of other . . . wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. . . .

Even apart from these violations, Manville's method of proving character is impermissible under Evidence Rule 405. That rule allows character to be proved, where character is admissible, generally only by reputation or opinion testimony. Here, Manville attempted to prove ANWC's character by its specific conduct of not issuing warnings and recalls after it knew of the Manville accident. Alaska Rule of Evidence 405(b) permits character to be proved by specific conduct only "in cases in which character or a trait of character . . . is an essential element of a . . . claim." Alaska Rule of Evidence 405(b).

■ Here, indeed, the defendant's recklessly indifferent state of mind is a character trait that is an "essential element" of

the punitive damages claim. Restatement (Second) of Torts § 908 Comment b (1979). However, it is neither the specific character trait of ANWC's post-accident failure to remedy nor its general character trait (or "pattern") of callous and reckless disregard, that is "at issue" in Manville's punitive damages claim. Rather, the character element essential to Manville's claim is ANWC's pre-accident recklessly indifferent state of mind involved in her underlying compensatory damages claim. Therefore, Evidence Rule 405 serves to deny Manville the opportunity to prove the character evidence which is also inadmissible for her purposes under Evidence Rule 404(a) and (b). Accordingly, it was error to admit this evidence.[3]

■ Having concluded that there was error in admitting this evidence, we need to determine whether it was harmless. In Alaska, the rule is that an error is not harmless unless the reviewing court "can say with fair assurance . . . that the jury was not substantially swayed or affected by the error." *Adkins v. Lester*, 530 P.2d 11, 18 (Alaska 1974), *reh. denied*, 532 P.2d 1027 (Alaska 1975).

■ There are three major considerations in the case which bear on this question: 1) the jury was not in fact so swayed by the erroneously admitted evidence that they awarded punitive damages against ANWC—the sole issue for which the evidence was offered; 2) the jury carefully allocated the liability three ways: ANWC—90%; the watermattress retailer—5%; Manville—5%; 3) the two post-accident conduct questions actually received relatively minor emphasis at the trial, and on review of the whole record they seem to have played a fairly innocuous role in the

---

**3.** One possible problem with our finding the trial court in error for admitting this evidence is the fact that ANWC only objected on the grounds of irrelevance and prejudice. While the usual requirement of a specific objection was not fulfilled here, the objector did state the basic rationales for the character evidence exclusion. We see no need to exhalt form over substance in this instance.

This is especially true when an Evidence Rule 403 analysis, for which ANWC did make proper objection, would yield the same result. That is, the low probative value of the evidence would be outweighed by the risk of confusion and prejudice and require exclusion. Alaska R.Evid. 403. Our conclusion that the admission of this evidence was harmless error would be unchanged by this alternative analytical path.

jury's deliberation. *See Bachner v. Rich*, 554 P.2d 430, 447 (Alaska 1976).

Accordingly, we conclude that the erroneous admission of this evidence was harmless.

### III. Was a video tape of the waterbed experiment properly admitted?

At trial, Manville presented a video tape of an experiment conducted out of court by its expert. The tape shows a waterbed of the same make and model as Manville's, set on a pedestal of the same dimensions as Manville's. The waterbed was set up with the total amount of water recommended in the instructions; however, some of the water was put into the surrounding air frame to simulate the effect of a leak between the water and air compartments.

During the experiment, Manville's expert periodically released air from the air frame and then walked around the mattress and lifted and pushed it to show the effect each release of air had on its stability. After several releases of air, the expert rolled into the air mattress and it flipped off the pedestal, ending up on top of the expert on the floor.

The tape is technically well done. The photography is clear. The video tape is not overdramatized.

At trial, the video tape was shown to the jury with the expert narrating it.

ANWC objected to the admission of the video tape on the grounds that the test had not been developed under conditions substantially similar to those existing in Manville's bedroom on the night of the accident.

ANWC raised four basic dissimilarities. First, the amount of air and water in the experimental mattress may have been different than Manville's. Second, the experimental mattress had no protective liner. Third, there did not appear to be air in the water part of the experimental mattress while there probably were bubbles in the Manville mattress. Fourth, ANWC claims the expert got into the bed differently than did Manville.

The leading Alaska case on the admissibility of experimental evidence is *Love v. State*, 457 P.2d 622, 627 (Alaska 1969). In *Love*, the defendant had been arrested for fishing in a closed area. He defended on the grounds that he had set his net in an open area, and his boat had unintentionally drifted into the closed area. In an attempt to refute this defense, the prosecution presented an experiment where a different boat was allowed to drift in approximately the same spot as the defendant was caught.

The court held that the evidence of the experiment had been erroneously admitted because it lacked a substantial similarity to conditions at the time of the event in question. While the experiment had been conducted in approximately the same spot and with the same tide, the court noted the boat had a different length and draft. Also the test boat, unlike the defendant's, had no net in the water and the net could be affected by both water and air currents. In addition, there was no showing of a similarity in wind conditions on the two days. Finally, the state had offered no expert testimony at trial to explain the effect these dissimilarities might have on the drifting of the boat.

In arriving at its conclusion that the experiment was inadmissible, the court noted:

> It is stated almost universally that for such evidence to be admissible, it should have been developed under conditions substantially similar to those surrounding the event in issue. The rule of substantial similarity does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative. In some cases a high degree of similarity may not be attainable, yet the evidence nevertheless may be enlightening to the jury.

457 P.2d at 627 (footnotes omitted).

The court went on to note that the determination involves a balancing process:

> As with other forms of circumstantial evidence, the trial judge may, in his discretion, exclude the experimental evidence after a determination that the probative value of the experimental evidence is outweighed by the possibility of prejudice, confusion of the issues or undue

consumption of time. This discretion is, however, dependent upon a showing of substantial similarity of conditions by the proponent of the evidence.

*Id.* (footnote omitted).

The court listed two principles to be followed in applying the above tests:

Are the dissimilarities likely to distort the results of the experiment to the degree that the evidence is not relevant? Can the dissimilarities be adjusted for or explained so that their affect on the results of the experiment can be understood by the jury?

457 P.2d at 628.

The next Alaska case to pass on the admissibility of experimental evidence was *Nicholson v. State*, 570 P.2d 1058 (Alaska 1977). *Nicholson* was a homicide case. An important issue in the case was where the perpetrator was standing when he fired the fatal shots. As part of its case, the state presented the results of an experiment conducted with the defendant's shotgun. The purpose of the experiment was to determine the distance and direction traveled by the spent shells. Under the first required *Love* determination, this court held that the ejection pattern of the shells was irrelevant because of differences in the ground surface. However, since the judge had limited the jury to considering the direction and air distance traveled, the admission was upheld as relevant under the second half of the *Love* test. *Id.* at 1065.

Finally, the most recent Alaska case on the issue is *Stumbaugh v. State*, 599 P.2d 166 (Alaska 1979). In this arson case, the state introduced into evidence the results of an experiment using a candle as a "delayed fuse" device for starting a fire. The defendant had been accused of soaking his trailer rug with diesel fuel, lighting a candle, setting it in the middle of the carpet, and then leaving, to be elsewhere when the fire actually broke out.

The experiment was conducted in an abandoned box car with a six-foot carpet scrap soaked in diesel fuel oil. The piece of carpet was placed in a metal pan and a lit candle was placed on the carpet. Over an hour later, the candle had burned down and ignited the carpet.

This court held that the experimental evidence had been properly admitted. The court noted that the defendant's objections as to lack of similarity all went to the exact time that it took the candle to burn down and ignite the rug. However, the exact time was not the important issue at the trial. The purpose of the experiment was simply to show that a candle could have been used as a time delay device and to determine whether the resulting fire would totally consume the candle and leave a burn pattern similar to that found in the defendant's trailer. The court held that the conditions were sufficiently similar to make the experiment probative. 599 P.2d at 172.

In the present case, the experiment easily meets the standards of *Love* and its progeny. First, there was a substantial similarity of conditions. The same make and model of air mattress was tested on the same size pedestal. The expert testified that the waterbed had been set up according to the manufacturer's directions, except for allowing water into the air frame to simulate an intercompartmental leak. Second, Manville's expert satisfactorily explained the effect of the various dissimilarities. The expert testified that the lack of the plastic liner would have no effect on the results. He also testified that air added to the water compartment would have no effect. Finally, ANWC's claim that the way the expert rolled into the bed was different than the way Manville got into bed on the night of the accident was a fact question for the jury. They could themselves compare the video tape scene with Manville's testimony as to how she got into the bed that night.[4]

■ In conclusion, the results of the experiment were sufficiently probative to outweigh any possibilty of confusing the issues or misleading the jury. The experiment

4. "In deciding whether or not a test or experiment should be admitted it is not the court's role to pick and choose among the various versions of the underlying incident, nor should it draw inferences which the jury would not necessarily draw." *Patricia R. v. Sullivan*, 631 P.2d 91, 101 (Alaska 1981).

was enlightening to the jury in showing how the waterbed reacted with varying amounts of air in its frame. Such a "bench-mark" test was proper.

IV. Did the trial court abuse its discretion in allowing Manville to call in rebuttal a witness to impeach another witness which Manville had presented in her case in chief, where the trial court had originally refused to allow the impeaching witness to testify in the case-in-chief?

ANWC hired an investigator, Tom Wilton, to observe Manville prior to trial. Shortly before trial, Manville learned of a report of the investigator that he had seen Manville driving the car of a friend, Jeneva Slack. One of Manville's claims at trial and in deposition was that injuries from the accident had prevented her from driving. In order to dull the impact of the investigator's report, Manville called him to the stand during her case-in-chief. Manville sought the court's permission to then present the owner of the car as an impeaching witness, also during her case-in-chief. The court denied permission, but later held that it would allow the impeaching witness to testify in rebuttal at the end of the defendant's case.

ANWC maintains that the trial court abused its discretion in allowing Manville to present the impeaching witness in rebuttal.

Civil Rule 46(b) and (c) control the order of presenting evidence at trial:

Unless otherwise ordered by the court, which may regulate the order of proof in the exercise of sound discretion, the plaintiff shall ... introduce evidence on his part, and when he has concluded the defendant shall do the same.

The parties may then respectively introduce rebutting evidence only, unless the court, for good reason and in the furtherance of justice, permits them to introduce other evidence.

This rule allows the trial court to modify the order of proof in the exercise of sound discretion for good reason and in the furtherance of justice.

In addition, our cases hold that the trial judge is vested with wide discretion in controlling the order of proof. His decision will not be upset unless an abuse of discretion is clearly shown. *Western Airlines, Inc. v. Lathrop Co.,* 499 P.2d 1013, 1020 (Alaska 1972); *Gafford v. State,* 440 P.2d 405, 409–10 (Alaska 1968), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969); *Pederson v. State,* 420 P.2d 327, 337–38 (Alaska 1966); *Gunsolus v. City of Fairbanks,* 391 P.2d 13, 14–15 (Alaska 1964). Also, the universally accepted common-law rule is that the trial court has the discretion to allow the presentation of the case-in-chief evidence in rebuttal. C. McCormick, *supra,* § 4, at 5–6; 6 J. Wigmore, Evidence § 1873, at 672–79 (Chadbourne rev. 1976).

While not in effect at the time of this trial, current Evidence Rule 611(a) is persuasive on the trial judge's proper exercise of power in controlling the order of proof:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

The reason for granting the trial judge an almost unlimited discretion in deciding on the order of proof is set out in the comment to Evidence Rule 611(a):

Spelling out detailed rules to govern the mode and order of interrogating witnesses and presenting evidence is neither desirable nor feasible. The ultimate responsibility for the effective working of the adversary system rests with the judge. The rule sets out the objectives which he should seek to obtain.

The comment goes on to say that rule 611(a)(1) above is directed toward "the order of calling witnesses and presenting evidence," and that this question "can be solved only by the judge's common sense and fairness in view of the particular circumstances."

In its brief, ANWC cites numerous cases upholding a trial court's exercise of discre-

tion in excluding rebuttal evidence as either cumulative or properly belonging in the case-in-chief. However, ANWC has not produced a single case where an appellate court *reversed* a trial court for *allowing* case-in-chief evidence to be presented in rebuttal. Therefore, ANWC's cases are of little assistance here where the trial court allowed case-in-chief evidence to be presented in rebuttal.

Finally, Wigmore has noted:

> In general, such discretionary variations [in the order of proof] should be liberally dealt with; for nothing can be more irrational or more unjust than to apply the judicial lash of a new trial to errors of trivial importance.

6 J. Wigmore, Evidence § 1874, at 679 (Chadbourne rev. 1976). As a corollary to this statement it may be safely said that most errors in the order of proof would be harmless. Very infrequently would the result of a trial be changed merely by presenting the evidence in a different order.

██ In the present case, the trial court exercised its discretion in allowing Manville to present, during rebuttal, a friendly witness to impeach a hostile witness which had been called by Manville in her case-in-chief. Particularly in light of the late discovery of the hostile witness' report, it cannot be said that the trial court abused its discretion.

## V. Was the jury's verdict of $146,715 excessive in light of the evidence?

The jury awarded Manville a total verdict of $146,715. ANWC claims that evidentiary errors alleged in the four previous issues "inflamed the jury to such an extent that it returned a verdict which was grossly excessive in light of the evidence."

██ The leading Alaska case on tort damages is *Beaulieu v. Elliott*, 434 P.2d 665 (Alaska 1967). In *Beaulieu*, a judge-tried case, this court set out the standard to be used in deciding whether an award of damages is excessive:

> We shall not set aside an award on a claim of excessiveness unless it is so large as to strike us that it is *manifestly unjust*, such as being the *result of passion or prejudice* or a disregard of the evidence or rules of law.

*Id.* at 676 (footnote omitted) (emphasis added).

In *Fruit v. Schreiner*, 502 P.2d 133 (Alaska 1972), this court upheld a jury verdict awarding $635,000 to a 64-year-old man with a life expectancy of 13.5 years who had lost the use of both of his legs. The court repeated the rule from *Beaulieu*, holding that it applied equally well to jury trials. After making reductions for approximations of various special damages, the court arrived at the conclusion that the plaintiff had been awarded approximately $350,000 in general damages. The court held that in light of the plaintiff's serious injuries, this amount would withstand the *Beaulieu* test. *Id.* at 145.

In *Grasle Electric Co. v. Clark*, 525 P.2d 1081 (Alaska 1974), this court made clear that in judging whether an award of damages is excessive this court "must 'view the evidence and all inferences reasonably deducible therefrom in the light most favorable'" to the victim. *Id.* at 1082 (quoting *City of Fairbanks v. Smith*, 525 P.2d 1095, 1095 n.2 (Alaska 1974)).

ANWC has cited several Alaska cases in its brief in support of the contention that the jury verdict was excessive. However, none of these cases support ANWC's position. These cases are supreme court affirmances of awards. Not one of them is a *reversal* of a judgment or verdict *as excessive*, thereby setting a precedential limit.

Also, ANWC's long list of cases where damage awards have been reviewed are largely irrelevant and without precedential value. As this court stated in *Fruit v. Schreiner*, 502 P.2d 133 (Alaska 1972):

> All parties to this appeal have cited cases involving substantial awards. The defendants' citations are of cases where awards were reduced or involved amounts substantially under Schreiner's judgment, while plaintiff cites cases involving similar or larger awards. Since none of the cases present an exactly parallel factual situation and all involve substantial differences in time of injury and locale with resulting different economic

factors, and laws relative to damages, we find little assistance in such cases.

*Id.* at 145 n.43. This statement of the limited precedential value of damage award cases directly conflicts with and controls over the prestatehood Alaska federal case of *Neal v. Matanuska Valley Lines,* 17 Alaska 706 (1958), upon which ANWC relies for the holding that such damage awards are appropriate precedent.

In the present case, the jury found Manville's damages to be $146,715. This amount should have included special damages for medical expenses and lost earnings, both past and future. Manville had already incurred medical expenses in excess of $10,-000 and there was evidence that she would incur the same amount in the future. There is evidence in the record to support a finding of lost wages, past and future, of anywhere from $70,000 to $185,000. Even using $90,000 as a minimum estimate of Manville's total special damages as reflected by the evidence in the record, this would leave approximately $55,000 as compensation for pain and suffering and for loss of enjoyment of life, both past and future.

The evidence as to pain and suffering showed that Manville spent over eleven hours pinned under the waterbed, unable to move any part of her body except her head and one hand. She testified as to enduring excruciating pain that night, so bad that she wished she could die. As a result of the accident Manville sustained pressure burns, including second and third degree burns to the left arm and second degree burns to the right leg. She suffered complete radial nerve palsy of the left arm. She also suffered perineal nerve injury to both legs. In addition, she spent a substantial amount of time convalescing in the hospital.

The evidence as to loss of enjoyment of life shows that prior to the accident Manville was vigorous, loved the outdoors, used her automobile daily for transportation, mobility and independence, and worked six days a week full-time, leading an active life even though well past retirement age.

After the accident, she underwent various operations and treatments (including the removal of a toe joint) but still has difficulty walking. She has also experienced a general decline in health and strength and mental ability. In addition, she can neither work full-time nor drive.

■ In light of the above evidence and the standards set out in *Beaulieu, Fruit,* and *Grasle,* and despite the fact that Manville was 76 years old and had a 10 year life expectancy, it simply cannot be said, when viewing the evidence most favorably to the victim, that the $55,000 presumably awarded for general damages is "manifestly unjust," the "result of passion or prejudice or a disregard of the evidence or rules of law." *Beaulieu v. Elliott,* 434 P.2d at 676.

VI. Was there sufficient evidence of lost earning capacity before the jury to justify an instruction?

ANWC claims there was insufficient evidence to support an instruction for lost earning capacity.

The two leading Alaska cases on the impairment of earning capacity are *City of Fairbanks v. Nesbett,* 432 P.2d 607 (Alaska 1967), and *Morrison v. State,* 516 P.2d 402 (Alaska 1973).

In *Nesbett,* this court held:

Impairment of earning capacity means the permanent diminution of the ability to earn money. The determination of award of impairment of future earning capacity involves two distinct considerations, namely, determination of the extent of an earning capacity and the measurement of loss therefrom.

432 P.2d at 617 (footnotes omitted).

The court then went on to hold that the lost earning capacity instruction in *Nesbett* should not have been given because there was *no* evidence in the record as to the effect of the ankle injury on the plaintiff lawyer's earning capacity. The court noted that the rule requiring a showing of loss is strictly applied in cases where a professional person is seeking to recover damages for lost wages. In that case, the jury could not have determined the plaintiff's loss of earning capacity from just knowing the nature of his injury (injured ankle) and his occupation (attorney). 432 P.2d at 617.

In *Morrison*, this court emphasized *Nesbett's* holding "that impairment of earning capacity is the permanent diminution of the *ability* to earn money." 516 P.2d at 404 (emphasis in original). We said that the appellant was "correct in her contention that the trial judge should have made his award for appellant's lost earning *capacity* rather than 'lost earnings.'" *Id.* In that case the appellant was a young woman. The judge awarded her only five years of future lost wages on the assumption that at the end of five years she would have left the work force and become a housewife. This court made it clear that "as a normal housewife, she would still be entitled to an award for impaired earning capacity, because she has lost the capacity to work in commercial enterprises." 516 P.2d at 405.

ANWC's major contention on the issue of impairment of future earning capacity is that Manville had no such capacity because she had worked for the family-owned business for many years for an almost nominal salary, even though she maintained a forty-eight hour work week.

This contention is directly rebutted by this court's holding in *Morrison*, 516 P.2d 402, where this court held that a woman who voluntarily foregoes wages in the commercial market in order to work as a housewife is nevertheless entitled to an award for lost earning *capacity*. *Id.* at 404–05.

Next, ANWC argues that *Nesbett*, is authority for the proposition that the evidence in the present case was insufficient to allow a jury instruction. However, the two cases are not the same. As noted above, the attorney in *Nesbett* presented *no* evidence of his lost earning capacity. Here, as shown below, Manville produced substantial evidence of her lost earning capacity.

In the present case, Manville worked six days a week full-time at the family-owned business. After the accident she could not work more than twenty hours per week. If it were not for her injuries, there is substantial evidence that she would still be working a forty-eight hour week. Manville had no plans for retirement.

In addition, Manville's expert provided evidence on the value of Manville's services to the family business. Using various wages and numbers of hours per week, the expert calculated Manville's future earning capacity loss as anywhere from $70,000 to $185,000.

The evidence also showed that the family business was required to hire additional employees to perform work which Manville was doing before the accident.

Finally, there was medical testimony as to Manville's impaired mental and physical health following the accident which would interfere with her ability to work.

In conclusion, there clearly was sufficient evidence before the jury to allow the trial judge to instruct the jury on impairment of future earning capacity.

### Cross-Appeal

I. Did the trial judge err in the method he used for subtracting the amount of Pendley's settlement from the jury's verdict against ANWC?

The jury delivered a verdict which found that Manville had suffered $146,715 in damages. The trial judge then subtracted Manville's 5% comparative negligence and the $60,000 settlement with Pendley and added prejudgment interest, attorneys' fees, and costs to arrive at the final judgment. The court computed the final judgment as follows:

| | |
|---|---|
| Total Jury Verdict | $146,715.00 |
| Manville's 5% Negligence | − 7,335.75 |
| Subtotal | 139,379.25 |
| Settlement | − 60,000.00 |
| Subtotal | 79,379.25 |
| Prejudgment Int. 8% 3/11/77 − 1/17/79 | + 11,778.58 |
| Rule 82(a) Atty Fees | + 9,965.78 |
| Subtotal | 101,123.61 |
| Costs | + 5,298.31 |
| (Incorrect Total Shown on the Judgment Because of Addition Error) | (104,373.61) |
| Correctly Added Judgment Principal | $106,421.92 |

Before the trial court computed the above final judgment, Manville requested it to use the following method of computation instead:

| | |
|---|---|
| Total Jury Verdict | $146,715.00 |
| Manville's 5% Negligence | − 7,335.75 |
| Subtotal | 139,379.25 |

| Prejudgment Int. 8% | |
|---|---|
| 3/11/77 – 1/17/79 | + 20,712.48 |
| Subtotal | 160,091.74 |
| Rule 82(a) Atty Fees | + 16,859.17 |
| Subtotal | 176,950.91 |
| Settlement | – 60,000.00 |
| Subtotal | 116,950.91 |
| Costs | + 5,298.31 |
| | |
| Judgment Principal | $122,249.22 |

In support of her proposed method of calculation, Manville argues three basic theories. First, she maintains that the wording of AS 09.16.040(1), Alaska's Uniform Contribution Among Tortfeasors Act, requires that the amount of the settlement be subtracted after adding prejudgment interest and attorneys' fees to the jury verdict. She states that this result follows from the requirement that one tortfeasor's settlement "reduces the claim against the others." She contends that "claim" must mean total judgment, including prejudgment interest and attorney fees. Manville has cited no authority for this interpretation of the word "claim," and it is entitled to little merit in light of the considerations discussed later under this issue.

Second, Manville claims that Civil Rule 68, regarding offers of judgment by defendants, supports her suggested computations. On this contention, Manville is correct insofar as Rule 68 cases indicate that an offer of judgment (or settlement) "must be construed as including the defendant's assessment of all of the damages that plaintiff is entitled to, including that occasioned by the loss of use of the money." *Davis v. Chism*, 513 P.2d 475, 482 (Alaska 1973).

Third, Manville argues that the public policy toward encouraging settlement requires her suggested computation. We believe that this public policy interest will be adequately served by our holding expressed below.

On the other hand, ANWC maintains that the superior court's method was correct. ANWC objects to Manville's suggested computation chiefly on the grounds that it would amount to a windfall recovery in that Manville would recover interest on the settlement money from the date it was paid

her, until the date of judgment, even though she had not been deprived of the money during that time.

This court originally began the broad application of prejudgment interest on all claims, whether or not liquidated, in *State v. Phillips*, 470 P.2d 266, 272–74, (Alaska 1970),[5] an action against the state. Later, the court made it clear that the broad application of prejudgment interest applies against all types of defendants, not just the state. *Beech Aircraft Corp. v. Harvey*, 558 P.2d 879, 888 n.30 (Alaska 1976); *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 590–91 (Alaska 1976).

In *Davis v. Chism*, 513 P.2d 475, 481 (Alaska 1973), this court held that prejudgment interest is in the nature of compensatory damages, not costs. Since *Davis*, this court has repeatedly reaffirmed this characterization and used it as the guiding rationale in deciding when and how to award prejudgment interest. *City and Borough of Juneau v. Commercial Union Ins. Co.*, 598 P.2d 957, 959–60 (Alaska 1979); *Guin v. Ha*, 591 P.2d 1281, 1285–86 (Alaska 1979); *Beech Aircraft Corp. v. Harvey*, 558 P.2d 879, 888 (Alaska 1976); *Haskins v. Shelden*, 558 P.2d 487, 494 (Alaska 1976); *ERA Helicopters, Inc. v. Digicon Alaska, Inc.*, 518 P.2d 1057, 1063 (Alaska 1974); *State v. Stanley*, 506 P.2d 1284, 1295 (Alaska 1973). The purpose of awarding prejudgment interest is that money is worth less the later it is received. Therefore, in order to make a plaintiff whole, prejudgment interest is necessary to compensate plaintiff for the loss of the use of the money from the date of injury until the date of judgment. *Davis v. Chism*, 513 P.2d at 481; *City and Borough of Juneau v. Commercial Union Ins. Co.*, 598 P.2d at 959.

Conversely, prejudgment interest deprives a defendant of unjust enrichment resulting from the use of money which actually belongs to the plaintiff from the date of injury, thereby encouraging settlement. *Drickerson v. Drickerson*, 604 P.2d 1082, 1087 n.8 (Alaska 1979); *State v. Phillips*, 470 P.2d at 274.

5. *Cf. Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1245 (Alaska 1974).

Finally, in applying prejudgment interest, courts are warned to carefully guard against the possibility of double recovery. *Beech Aircraft Corp. v. Harvey*, 558 P.2d at 888; *Haskins v. Shelden*, 558 P.2d at 495; *State v. Stanley*, 506 P.2d at 1295.

■■■ With the above policy considerations in mind, we hold that ANWC's and the trial court's method of computing the final judgment was incorrect. This method deprived the plaintiff of her prejudgment interest on $60,000 from the date of injury until the date of settlement.

On the other hand, Manville's suggested computation is also wrong. Her calculations provide her with a windfall recovery since she recovers interest on the $60,000 settlement from the date of settlement to the date of judgment, when she was not deprived of the use of the money during that period.[6]

Therefore, the right solution lies somewhere between the contentions of the parties. The plaintiff should receive that amount which would make her whole, and no more. This can be done by treating the $60,000 as a payment on the final judgment, with the $60,000 itself containing both prejudgment interest and principal. "Principal" here means the amount that is credited as payment on the total which the jury found as damages after subtracting the plaintiff's 5% comparative negligence and before considering prejudgment interest. It is the principal amount of the settlement for which ANWC should get allowance.

Our first task is to calculate the principal. We can derive an algebraic formula as follows:

1) We start with two formulas that express our premises:

a) $S = I + P$,

Where S is the amount of settlement, I is the amount of interest, and P is the amount of principal.

b) $I = RP$,

Where R is the applicable rate of interest.

2) Then we simply manipulate these formulas to get one that will solve for "P."

| | | |
|---|---|---|
| a) | $S = I + P$ | Premise. |
| b) | $I = RP$ | Premise. |
| c) | $S = RP + P$ | Substitute the "b" formula into the "a" formula. |
| d) | $S = P(R + 1)$ | Factor out "P" from the right side of the "c" formula. |
| e) | $\dfrac{S}{R + 1} = P$ | Divide both sides of the "d" formula by "R + I" in order to solve for "P." |
| 3) | $P = \dfrac{S}{R + 1}$ | This formula will yield the *principal amount* of the settlement. |

To apply the formula, we need to know S and R. It is clear that S is the $60,000 settlement amount. While the statutory prejudgment interest rate then in effect was 8% per annum, we have to calculate the applicable rate of interest, R, which covers the one year and two hundred and ninety-two days between when the cause of action arose, March 11, 1977, and the date of settlement, December 28, 1978. This calculation works out as follows:

1) 3/11/77 – 3/11/78: .08 per annum rate

2) 3/11/78 – 12/28/78:

 a) $\dfrac{292}{365} = .8$ portion of the year

 b) .8 x .08 = .064 rate for .8 year

3) sum of 1) and 2): .144 = R

With these figures in place we can calculate the principal of the settlement:

1) $P = \dfrac{S}{R + 1}$ Formula

2) $P = \dfrac{\$60,000}{.144 + 1}$

3) $\dfrac{\$60,000}{1.144} =$ $52,477.55

4) $52,477.55 is the principal.

After putting the principal amount into the calculation of the final judgment, the correct computations are:

---

**6.** Also, Manville's accompanying suggestion of adding attorneys' fees before subtracting the amount of settlement is inconsistent with Civil Rule 82's characterization of attorneys' fees as costs. Attorneys' fees must be based only on net, not gross, recovery. *See Fairbanks Builders, Inc. v. Sandstrom Plumbing & Heating, Inc.*, 555 P.2d 964, 967 (Alaska 1976).

| | |
|---|---|
| Total Jury Verdict | $146,715.00 |
| Plt's 5% Negligence | − 7,335.75 |
| Subtotal | $139,379.25 |
| Principal of Settlement | − 52,447.55 |
| Subtotal | 86,931.70 |
| Prejudgment Interest 8% 3/11/77 − 1/17/79 | + 12,865.89 |
| Subtotal | 99,797.59 |
| Rule 82(a) atty fees | + 10,830.52 |
| | $110,601.65 |
| Costs | 5,298.31 |
| Judgment Principal | $115,899.96 |

In conclusion, the trial court is affirmed on all issues except as to its method of computing the final judgment principal. On that issue only, the trial court is reversed and the case remanded for the sole purpose of recomputation in accordance with this opinion.

MATTHEWS and COMPTON, JJ., not participating.