2005 SD 40

**REUBEN C. SETLIFF, III, M.D., P.C., Plaintiff and Appellee,**

v.

**Randall L. STEWART, Defendant and Appellant.**

No. 22937.

Supreme Court of South Dakota.

Argued June 2, 2004.

Decided March 23, 2005.

Kent R. Cutler, Mark E. Salter and Kimberly R. Wassink of Cutler & Donohoe, Sioux Falls, South Dakota, Attorneys for plaintiff and appellee.

Mark V. Meierhenry and Clint L. Sargent of Danforth, Meierhenry & Meierhenry, Sioux Falls, South Dakota, Attorneys for defendant and appellant.

KERN, Circuit Judge.

[¶ 1.] Dr. Reuben Setliff (Setliff) brought claims for breach of employment contract, breach of a duty of loyalty, and conspiracy against Dr. Robert Akins (Akins) upon his departure from Setliff Medical Clinic (Clinic). Setliff also brought claims against consultant Randall Stewart (Stewart) for wrongful interference with business relations and conspiracy. Akins counterclaimed for breach of employment contract and libel. The trial court granted summary judgment to Akins and Stewart on all of Setliff's claims and partial summary judgment to Setliff on Akins' claim of breach of employment contract. The trial court denied Setliff's motion for summary judgment on Akins' libel claim. All parties appealed and, in *Setliff v. Akins*, 2000 SD 124, 616 N.W.2d 878, we affirmed the trial court's denial of Setliff's motion for summary judgment on the libel claim, but reversed the grant of summary judgment on all other claims and remanded the entire case for trial. At trial, Setliff pursued his claims that Stewart conspired with Akins to breach Akins' duty of loyalty to the Clinic and that Stewart wrongfully interfered with the business relationship between Akins and the Clinic. The day prior to trial, Akins settled with Setliff for $50,000. The jury awarded Setliff a verdict of $260,000 against Stewart and the trial court calculated prejudgment interest on the entire amount in the sum of $90,462.10.

[¶ 2.] Stewart appeals alleging the trial court should have directed a verdict for him on both counts. Further, he alleges the trial court miscalculated prejudgment interest and abused its discretion in denying his motion to dismiss for failure to timely prosecute the case.

[¶ 3.] We affirm in part, reverse in part and remand.

## FACTS

[¶ 4.] This case was previously before this Court in *Setliff v. Akins*, 2000 SD 124, 616 N.W.2d 878 (*Setliff I*). Many of the facts are detailed more particularly in *Setliff I*. This action was initially commenced by the Clinic against Akins in 1998 after Akins left his employment with the Clinic two months prior to the completion of a one-year employment contract. Within weeks after leaving the Clinic, Akins opened a new competing medical practice known as Great Plains Sinus Care, P.C. (Great Plains). During the course of discovery, Setliff uncovered the complicity of Stewart in Akins' departure from the Clinic and Stewart was added as a defendant in the lawsuit.

[¶ 5.] At trial, upon the remand, the evidence established that Setliff is a board-certified otolaryngologist specializing in rhinology, which involves the care and treatment of sinus disorders. Setliff operates a clinic in Sioux Falls, South Dakota, with branch offices in Omaha, Rapid City and Dakota Dunes.

[¶ 6.] Setliff originally hired Akins in April 1997 as he needed help with his expanding practice. The terms of Akins' employment agreement were discussed in an informal setting with five pages of notes being prepared to memorialize the terms.

[¶ 7.] Setliff trained Akins in his techniques and procedures, even ordering a cadaveric specimen which he dissected with Akins one-on-one. During the early months, Akins shadowed Setliff to learn the practice. Setliff reviewed videotapes of several of Akins' surgeries to provide him with helpful suggestions.

[¶ 8.] When Akins began working at the Clinic, Stewart was also working for Setliff, having been hired as an independent consultant on February 15, 1997. Stewart had access to the Clinic's financial records and other confidential information. As one of his primary duties, Stewart was charged with memorializing the details of Akins' employment agreement in a written contract. Setliff testified that this was Stewart's main responsibility and was number one on his to do list. Stewart hired the law firm of Davenport, Evans, Hurwitz and Smith (Davenport Evans) to prepare a draft contract from the written notes of the verbal agreement. In early April 1997 Stewart mailed a draft of the contract to Akins' home in Utah. Akins did not sign the contract but did move to Sioux Falls and began to work for Setliff. Stewart presented Akins with a second draft on May 20, 1997. Ultimately, Stewart was unable to obtain Akins' approval of a written employment contract prior to his own departure from the Clinic on May 31, 1997.

[¶ 9.] Stewart befriended Akins immediately upon his arrival in Sioux Falls. Stewart even made a personal loan to Akins for $10,000. The two shared an interest in religion, had breakfast and lunch together from time to time and lived a few blocks from each other. They socialized outside of the office on many occasions. Akins and Stewart continued their personal relationship after Stewart's business relationship with the Clinic ended.

[¶ 10.] Within several weeks after Akins started at the Clinic, Akins and Stewart began discussing the possibility of Akins leaving the Clinic and the feasibility of opening a competing practice in Sioux Falls. As early as July or August 1997, Clinic employee Micki Schmidt recalled Akins mentioning that Stewart had proposed setting him up in a competing practice in Sioux Falls. Stewart would call the Clinic for Akins and the two continued to meet for lunch. Schmidt noticed that Akins' demeanor toward the Clinic was different.

[¶ 11.] In the fall of 1997, Setliff employee Mike Hurley recalled Akins coming to him to obtain numbers regarding his production at the Clinic. Akins told Hurley that Stewart had approached him about starting up his own practice. Akins testified that, not long after he began at the Clinic, Stewart suggested to him that he should leave to open a new practice.

[¶ 12.] Akins' and Stewart's efforts to establish a competing clinic were well underway by January 1998. The two arranged for office space in downtown Sioux Falls. Stewart directed Akins to office space that he owned. Akins initially objected to using the space owned by Stewart, but Stewart eventually persuaded him to select it for his new office. Stewart began construction to retrofit the space for Akins' new practice and purchased furniture and equipment for the new office. Both Stewart and Akins attended meetings with attorneys from Davenport Evans to incorporate the new business. Stewart planned to be a partner and intended to receive a percentage of the revenue generated.

[¶ 13.] Akins recalled consulting with Stewart regarding his decision to leave the Clinic. Stewart eventually told Akins that he should just leave the Clinic. Akins understood this to mean he should leave without giving Setliff any courtesy notice period before he left.

[¶ 14.] On, February 17, 1998, Akins abruptly resigned after delivering a resignation letter to the Clinic. Akins' resignation was effective immediately, leaving Akins' patients sitting in the waiting room at the Clinic. In the resignation letter, Akins offered to stay an additional thirty days if Setliff would agree to pay him according to a schedule that would provide him with compensation in addition to his salary. However, Akins made no other effort to discuss transitioning out of the practice. In fact, Akins did not even speak with Setliff concerning his departure. Akins testified that Stewart influenced him to leave the Clinic at the time and in the manner that he did.

[¶ 15.] Setliff did not respond to Akins' letter and Akins never returned to the Clinic. Less than a month later, on March 10, 1998, Akins opened Great Plains in Dakota Dunes and then opened his Sioux Falls office three days later.

[¶ 16.] The trial commenced on May 19, 2003. The day before trial, Setliff and Akins settled their claims and counterclaims for $50,000, payable to Setliff. The trial against Stewart ensued and the Minnehaha County jury rendered its verdict on May 21, 2003. The jury found that Stewart did unlawfully conspire with Akins to breach his duty of loyalty to Setliff. It also found Stewart intentionally and unjustifiably interfered with the business relationship between Akins and Setliff. The jury awarded the Clinic damages in the amount of $260,000 and the trial court calculated prejudgment interest on the damages awarded in the amount of $90,462.10.

[¶ 17.] Stewart argues that the trial court erred by failing to direct a verdict in his favor on the issues of civil conspiracy and tortious interference with business relations. Further, he alleges the court miscalculated prejudgment interest and abused its discretion in denying his motion to dismiss for failure to prosecute.

## STANDARDS OF REVIEW

### DIRECTED VERDICT—ISSUES ONE AND TWO

[¶ 18.] The standard of review of a trial court's ruling on a motion for a directed verdict is well-settled:

A motion for a directed verdict under SDCL 15–6–50(a) questions the legal

sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse. *Boxa v. Vaughn*, 2003 SD 154, ¶ 7, 674 N.W.2d 306, 309 (quoting *Veeder v. Kennedy*, 1999 SD 23, ¶ 25, 589 N.W.2d 610, 617 (quoting *Border States Paving, Inc. v. S.D. Dep't of Transp.*, 1998 SD 21, ¶ 10, 574 N.W.2d 898, 901)) (citations omitted).

■ [¶ 19.] Additionally, " '[a] motion for a directed verdict should be granted only when it would be the duty of the trial court to set aside a contrary verdict as manifestly against the entire evidence because reasonable men could draw but one conclusion therefrom.' " *McDonough v. Kahle*, 1999 SD 14, ¶ 8, 588 N.W.2d 600, 602 (quoting *Stevens v. Wood Sawmill, Inc.*, 426 N.W.2d 13, 16 (S.D.1988)).

## PREJUDGMENT INTEREST—<br>ISSUE THREE

■ [¶ 20.] Stewart contends that the trial court erred in its calculation of the amount of prejudgment interest by awarding Setliff interest on the entire verdict of $260,000 rather than excluding the $50,000 settlement from Akins and then calculating the interest. Prejudgment interest calculations are reviewed de novo. *See City of Sioux Falls v. Johnson*, 2001 SD 108, ¶ 8, 632 N.W.2d 849, 852. The question regarding the proper rate of prejudgment interest involves reconciliation between statutes and is a question of law reviewed under the de novo standard. *Id.* (citing *Welsh v. Centerville Twp.*, 1999 SD 73, ¶ 7, 595 N.W.2d 622, 624).

## FAILURE TO PROSECUTE—<br>ISSUE FOUR

■ [¶ 21.] "A trial court's dismissal for failure to prosecute is reviewed under an abuse of discretion standard." *Jenco, Inc. v. United Fire Group*, 2003 SD 79, ¶ 7, 666 N.W.2d 763, 765 (citing *Devitt v. Hayes*, 1996 SD 71, ¶ 7, 551 N.W.2d 298, 300). "We will not reverse a decision if 'we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion.' " *Id.* (citations omitted).

## ANALYSIS

## ISSUE ONE

[¶ 22.] **Whether the trial court erred by not granting a directed verdict on the issue of civil conspiracy.**

[¶ 23.] Stewart moved for a directed verdict on the civil conspiracy count arguing that Setliff did not establish the predicate tort of breach of loyalty (by failing to give timely notice of his termination with the Clinic). Stewart moved for a directed verdict on the interference with a business expectancy count arguing that Setliff did not establish any protected business relationship between Setliff and Akins. In both cases, the motions were grounded upon Stewart's contention that Akins was an at-will employee, and that as such, Akins was permitted to terminate his relationship with the Clinic at will. Stewart argues that the law does not require at-will employees to give any notice of termination, and the law does not recognize a protected business expectancy in an at-will business relationship.

[¶ 24.] Although Stewart raises a number of valid points concerning our jurisprudence on at-will employments, we need not determine whether our law on at-will employment precludes recovery. We need not reach the effect of an at-will relationship because: (1) *Setliff v. Akins*, 2000 SD 124, 616 N.W.2d 878 (*Setliff I* ) only held that the "at will" employment issue was inappropriate for summary judgment; therefore, there were disputed issues of fact to be resolved at trial concerning the at-will issue; (2) the trial court correctly instructed the jury to determine whether an at-will relationship existed, specifically including instructions to determine the nature and terms of the Setliff–Akins employment relationship[1]; and (3) under those instructions and the evidence in the record, the jury could have found that more than an at-will employment relationship existed.

[¶ 25.] Here, Setliff testified that there was an unwritten (or implied) employment agreement by which Akins was to receive a salary of $200,000 per year. He also produced five pages of notes memorializing the employment agreement. Considering this testimony and the inferences that could have been drawn from it, the jury could have found that Setliff and Akins had entered into an employment relationship or business expectancy involving terms other than an at-will relationship. Because such a finding would support a breach of loyalty finding in failing to give adequate notice of termination and an interference with a business expectancy, we need not examine the verdict under Stewart's assumption that there was only an at-will relationship. Having been correctly instructed, we must afford the jury's verdict a presumption of validity. *See State v. Moschell*, 2004 SD 35, ¶ 40, 677 N.W.2d 551, 564 (stating that this Court will only set aside a jury verdict when the evidence and the reasonable inferences from it fail to sustain any rational theory supporting the verdict).

[¶ 26.] Stewart's remaining assertion in Issue One is that there was insufficient evidence of the underlying tort of breach of loyalty to sustain the verdict for civil conspiracy. South Dakota law recognizes a cause of action for civil conspiracy. *See Setliff I*, 2000 SD 124 at ¶ 32, 616 N.W.2d at 889; *Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691 (S.D. 1993); *Time Out, Inc. v. Karras*, 469 N.W.2d 380, 385 (S.D.1991).

[¶ 27.] To establish a prima facie case of civil conspiracy, a plaintiff must prove:

(1) two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds on the object or course of action to be taken;

(4) the commission of one or more unlawful overt acts; and

---

1. In instructing the jury on civil conspiracy (which included the breach of duty of loyalty in employment), the trial court specifically instructed on the essential elements necessary to form an employment contract, the fact that an employment contract may be expressed or implied, the fact that a contract of employment may be oral or written, the fact that a contract of employment having no specified term may be terminated at will without reason unless the employer and employee otherwise agree, and the fact that the length of time that an employer and employee adopt for the estimation of wages is relevant to determining the term of employment.

So also, in instructing on the interference with a business relationship count, the trial court indicated that the jury must have found that Akins and Setliff had a valid business relationship or business expectancy. The Court's instructions defined that relationship and its other instructions on the formation of a contract also related to this theory.

(5) damages as the proximate result of the conspiracy.

*Setliff I*, 2000 SD 124 at ¶ 32, 616 N.W.2d at 889; In re TMJ Implants Prods. Liab. Litigation, 113 F.3d 1484, 1498 (8thCir.1997). This is not an independent cause of action, but is " 'sustainable only after an underlying tort claim has been established.' " *Hanten v. School District of Riverview Gardens,* 183 F.3d 799, 809 (8thCir.1999) (quoting *K & S Partnership v. Continental Bank,* 952 F.2d 971, 980 (8thCir.1991)). A civil conspiracy is, fundamentally, an agreement " 'to commit a tort.' " *Kessel v. Leavitt,* 204 W.Va. 95, 511 S.E.2d 720, 753 (W.Va.1998)(quoting *State ex rel. Myers v. Wood,* 154 W.Va. 431, 175 S.E.2d 637, 645 (W.Va.1970)). Setliff cites Akins' breach of his duty of loyalty as the underlying tort required for civil conspiracy to exist in this case.

[¶ 28.] Regarding the tort for breach of duty of loyalty, *in Setliff I* this Court held that "[p]ursuant to South Dakota law, all employees have a statutory duty of loyalty[.]" *Setliff I,* 2000 SD 124 at ¶ 17, 616 N.W.2d at 886. SDCL 60–2–13 provides: "An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, must always give the latter the preference." While this statute "does not flatly prohibit employees from pursuing their own interests, it does require an employee to prioritize. An employee must prefer his employer's business interests to his own." *Bushman v. Pure Plant Food International, Ltd.,* 330 N.W.2d 762, 764 (S.D.1983).

[¶ 29.] Nevertheless, even before the termination of the agency, the employee is entitled to make arrangements to compete in some cases. " '[I]t is the nature of [the employee's] preparations which is significant in determining whether a breach has occurred.' " *Setliff I,* 2000 SD 124 at ¶ 20, 616 N.W.2d at 886 (quoting *Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486, 493 (Colo.1989)). This determination is ultimately a question of fact for the jury. *Setliff I* at ¶ 19, 886.

[¶ 30.] Civil conspiracy is a well-recognized theory of recovery once an underlying tort is established. Upon review of the record, we find that there was more than ample evidence to support the jury's verdict:[2]

1. Stewart had access to the Clinic's records, as well as the financial information of the Clinic. He participated in the 'financial management' of the Setliff Clinic, reviewing financial reports and statements.

2. The evidence established that Stewart began to urge Akins to open a competing practice in Sioux Falls at least 6–7 months prior to Akins leaving the Clinic. Micki Schmidt testified:

Q. [By Setliff's counsel]: Did you, at some point, gain an understanding that Mr. Stewart had approached Bob Akins about going out and competing with the Setliff Clinic?

A. Yes.

Q. When was it that you first gained an understanding that these discussions were taking place?

---

2. Stewart failed to request a special interrogatory or special verdict form requiring the jury to apportion between the two causes of action. It is therefore impossible to determine whether the jury awarded damages for conspiracy, tortious interference or a combination of the two. Failure to submit a special verdict form or interrogatories to a jury waives any claim of error on this question. *See Thomas v. Sully County,* 2001 SD 73, ¶ 12, 629 N.W.2d 590, 594.

A. It wasn't very long after Dr. Akins had started. I would say within the first couple of months, at least.

Q. Okay. And what did you——what information did you learn within the first couple of months of Dr. Akins' coming to town, about discussions that he was having with Randy Stewart?

A. I very, very clearly remember a discussion at the back part of our clinic, where Dr. Akins confronted me and said, "Randy Stewart has told me that he would set me up in a practice in Sioux Falls. What do I do?"

Michael Hurley also testified regarding conversations between Stewart and Akins:

Q. All right. When was the next time that you are learning more about Mr. Stewart and Dr. Akins?

A. It was in the fall of '97. Dr. Akins had been in the practice, coming to me, getting numbers regarding production, and how busy he had been at this clinic. At that time, he mentioned that Randy had approached him, regarding starting his own practice.

Dr. Akins himself testified at trial that Stewart affected his relationship with Setliff:

Q. Would you agree that Randy Stewart influenced your decision to leave the clinic?

A. Yes.

3. Stewart urged Akins to leave the Clinic without providing notice.

Q. [By Setliff's counsel]: Did Randy Stewart have any discussions with you, between the date of your meeting with Dr. Setliff and Kathy Harris on February 11, 1998, and the date of your resignation, about how you should resign from the Setliff Clinic?

A. [By Akins]: Yes.

Q. Tell the jury what Mr. Stewart told you, about resigning from the Setliff Clinic.

A. He told me that I should just leave.

Q. What do you mean, "just leave?"

A. Don't go back.

Q. Do you recall the exact words that Mr. Stewart used, when he told you just to leave the Setliff Clinic?

A. Probably not the exact words, but to the tune of, "Just leave the bastard." Something along those lines.

* * *

Q. What did you understand Mr. Stewart's comments to mean, "Just leave the bastard?"

A. He didn't think that I owed Reuben Setliff anything, that I had been taken advantage of, and that I didn't owe him even the courtesy period.

4. Stewart continued to develop the idea of a new clinic with Akins, arranging meetings with attorneys to incorporate a new business and finding office space for the new clinic, which, interestingly, was office space owned by Stewart. Stewart retained the Davenport Evans law firm to help in the formation of the new sinus clinic.

5. Stewart retrofitted the office space for the new medical practice. Stewart also purchased furniture and equipment for the new office as early as January 1998, while Akins was still employed at the Setliff Clinic.

6. In February 1998, Akins, Setliff and consultant Kathy Karris met to further discuss Setliff and Akins' future relationship. At no time during this meeting did Akins indicate he was dissatisfied with his employment at Setliff Clinic or that he was contemplating resigning. In fact, Akins actually signed Articles of Incorporation for his new business the day *before* this meeting on February 10, 1998. Just one week after this meeting Akins resigned from the Setliff Clinic.

■ [¶ 31.] More than ample evidence exists to find that the underlying tort of breach of loyalty occurred. It could hardly be said that Akins preferred Setliff's business interests to his own as he surreptitiously developed his own clinic while in Setliff's employment.

■ [¶ 32.] Akins' lack of candor and failure to notify Setliff before departing is of particular concern under the specific facts of this case. Consistent with the highly fact intensive nature of the duty of loyalty inquiry, we do not announce a rule requiring employees in all instances to affirmatively notify an employer that they will be leaving. With regard to preparation to establish a competing enterprise, "liability for breach of fiduciary duty is not predicated upon … failure to make full disclosure, but rather 'upon some particular circumstance which rendered the nondisclosure harmful to [the employer] or upon [the employee's] wrongful conduct apart from the omission.'" *Crawford & Co. v. M. Hayes & Assoc., L.L.C.*, No. 00-2574, 2001 WL 788652 at *2 (4th Cir.2001) (unpublished opinion)(quoting *Maryland Metals v. Metzner*, 282 Md. 31, 382 A.2d 564, 570 n. 4 (Md 1978)). This principle was illustrated in a case in which a court found that a dairy salesman, as part of his duty not to unfairly compete with his employer, was:

> obliged to give plaintiff sufficient notice of his intention to quit so that his employer could train a new man to continue the route and thus be in a position to compete openly and fairly for existing patrons. By lulling it into a belief that he had reconsidered his intention to quit, Wolf deprived plaintiff on an opportunity to compete with him on even terms.

*Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 112 N.W.2d 42, 49 (1961). Similarly, in another case a court was partly influenced to find a breach of the duty of loyalty by the fact that a departing law partner denied to other partners that he was leaving the firm, while at the same time he was obtaining consent from his clients to transfer their cases to his new firm. *Meehan v. Shaughnessy*, 404 Mass. 419, 535 N.E.2d 1255, 1264 (1989).

■ [¶ 33.] If the existence of a duty to notify depends on the question of whether circumstances indicate that the unannounced departure would harm the employer, then that question in turn partly depends on the role played by the employee within the business. "The scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship. Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing lowlevel tasks." *Cameco, Inc., v. Gedicke*, 157 N.J. 504, 724 A.2d 783, 789 (N.J. 1999).

[¶ 34.] Under the facts presented at trial, the jury could have reasonably found a breach of this aspect of the duty of loyalty. Obviously Akins was a crucial employee recruited by Setliff to join his practice. A witness testified that Akins' abrupt departure with no notice resulted in general "chaos": the rescheduling of

surgeries scheduled weeks in advance, the cancellation of appointments with existing and new patients, and the arrangement for follow-up care for patients on whom Akins had operated up to the day before his departure. Further, a week before he left, Akins effectively misled Setliff when the two (along with a consultant) discussed their future relationship, and Akins gave no hint he was leaving.

[¶ 35.] In addition to supporting a determination that Akins had breached a duty of loyalty, there was more than ample evidence to sustain the jury's determination that a civil conspiracy occurred between Akins and Stewart. For these reasons, the trial court did not err when it denied Stewart's motion seeking a directed verdict on the issue of civil conspiracy to breach the duty of loyalty.

## ISSUE TWO

[¶ 36.] **Whether the trial court erred by not granting a directed verdict on the issue of tortious interference with business relations.**

[¶ 37.] This Court recognized the claim of tortious interference with a business relationship in *Tibke v. McDougall*, 479 N.W.2d 898 (S.D.1992). In *Tibke*, 479 N.W.2d at 908, the Court defined the tortious interference claim to include the following essential elements:

(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted.

[¶ 38.] Again Stewart focuses his argument regarding the tortious interference claim on his contention that the employment relationship between Akins and Setliff was that of an at-will employee. Stewart contends that South Dakota does not recognize an action by an at-will employer for tortious interference. As previously indicated, the jury was instructed on the essential elements necessary to form an employment contract and determined that Akins and Setliff had a valid business relationship or expectancy, thus Akins' argument fails.

[¶ 39.] In addition, and for the first time at any point in this litigation, Stewart claims that he is not liable to the Clinic on the tortious interference claim because his communications with Akins were protected by a qualified privilege for "truthful information" and "honest advice" contained in the Restatement (Second) of Torts § 772. Stewart urges this Court to adopt this privilege.

[¶ 40.] This defense is raised for the first time in this appeal. It has long been the rule in this state that a defense cannot be raised for the first time on appeal. *Buchanan v. Randall*, 21 S.D. 44, 109 N.W. 513 (1906). Accordingly, we need not address this issue further.

## ISSUE THREE

[¶ 41.] **Whether the trial court erred in the calculation of prejudgment interest.**

[¶ 42.] Stewart contends that the trial court incorrectly determined the prejudgment interest award by assessing prejudgment interest on the entire jury verdict of $260,000. Instead, he asserts that the settlement payment from Akins should have been deducted prior to the calculation of prejudgment interest. The jury was informed that Akins had settled with Setliff and they were not to consider the

settlement in awarding damages.[3] Akins settled with Setliff for $50,000. Thus, Stewart contends that prejudgment interest should have been assessed on $210,000, instead of $260,000.

[¶ 43.] Stewart raises an issue of first impression before this Court, namely: How should prejudgment interest be calculated and imposed when, prior to judgment against a non-settling tortfeasor, a joint tortfeasor settles with plaintiff thereby reducing the amount of any final judgment?

[¶ 44.] Under South Dakota law, a plaintiff may settle with a joint tortfeasor, whether before or after judgment, without discharging the remaining tortfeasor(s); however, the claim against the other tortfeasors is reduced by the amount of the settlement. SDCL 15–8–17.[4]

[¶ 45.] While we have not previously addressed the question of how to calculate prejudgment interest on settlements of this type in relationship to subsequent verdicts against joint tortfeasors, other states have grappled with this question and a variety of approaches have emerged. Before examining these approaches, we begin with an assessment of our own statute.

[¶ 46.] Prejudgment interest is mandatory, not discretionary in an action for recovery of damages. *Alvine v. Mercedes–Benz of North America*, 2001 SD 3, ¶ 29, 620 N.W.2d 608, 614. SDCL 21–1–11 provides for prejudgment interest on the amount of "damages," not the amount of "judgment." [5] SDCL 21–1–13.1 provides in pertinent part that:

> Any person who is entitled to recover damages, whether in the principal action or by counterclaim, cross claim, or third-party claim, is entitled to recover interest thereon from the day that the *loss or damage* occurred, except during such time as the debtor is prevented by law, or by act of the creditor, from paying the debt. (emphasis added).

[¶ 47.] The purpose of prejudgment interest is to do " 'justice to one who has suffered a loss at the hands of another person.' " *South Dakota SIF v. Homestake Mining Co.*, 1999 SD 159, ¶ 9, 603 N.W.2d 527, 529 (quoting *Honomichl v. Modlin*, 477 N.W.2d 599, 601 (S.D. 1991)). Prejudgment interest seeks to " 'compensate an injured party for [the] wrongful detention of money owed.' " *Id.* (quoting *S.D. Bldg. Auth. v. Geiger–Berger Assoc.*, 414 N.W.2d 15, 19 (S.D.1987)).

[¶ 48.] One approach for calculating prejudgment interest on a joint tortfeasor's settlement is to exclude the sum from the jury's verdict prior to assessing prejudgment interest. *See Freysinger v. Taylor Supply Company*, 197 Mich.App.

---

**3.** Jury Instruction 33A provided, "The fact that Dr. Setliff and Dr. Akins have settled their disputes is not an issue in this lawsuit. You must refrain from any inference, speculation or discussion about the settlement and must not consider it in making your decision."

**4.** SDCL 15–8–17 states:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

**5.** SDCL 21–1–11 states:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

349, 494 N.W.2d 870 (1992). Courts adopting this approach reason that the plaintiff, upon accepting the settlement, waives the right to prejudgment interest on the total amount of the judgment. The plaintiff, in essence, trades the security of a sum certain for the loss of interest accumulating during the waiting period between the date of injury and entry of final judgment. The state of Michigan has routinely held that prejudgment interest in civil cases may not be calculated on settlement amounts. *See Silisky v. Midland–Ross Corp.*, 97 Mich.App. 470, 296 N.W.2d 576 (1980); *Awedian v. Theodore Efron Mfg. Co.*, 66 Mich.App. 353, 239 N.W.2d 611 (1976). These appellate decisions, however, are based on the specific language of M.C.L. § 600.6013 which provides in part that "[i]nterest is allowed on a money judgment recovered in a civil action[.]" The Michigan courts interpreted this statute to mean that a settlement does not constitute a final judgment and therefore the settling plaintiff waives the right to interest. These cases are distinguishable, however, from our statutory scheme as SDCL 21–1–13.1 references the right to recover interest from the day that loss or damage occurred rather than the right to recover interest on a final judgment. Both Colorado and Texas have adopted an approach similar to Michigan's. *Miller v. Solaglas California, Inc.*, 870 P.2d 559 (Colo.Ct.App.1993); *Gutierrez v. Bussey*, 837 P.2d 272 (Colo.Ct.App.1992); *McKown–Katy v. Rego Co.*, 776 P.2d 1130 (Colo.Ct.App.1989), *rev'd in part on other grounds*, 801 P.2d 536 (Colo.1990); *Fuller–Austin Insulation Co., Inc. v. Bilder*, 960 S.W.2d 914 (Tex.App.1998); *Owens–Corning Fiberglas Corp. v. Schmidt*, 935 S.W.2d 520 (Tex.App.1996).

[¶ 49.] Other states, however, have adopted the view proposed by Setliff that the entire settlement amount should be included in the judgment for purposes of calculating prejudgment interest. *In re Joint Eastern Dist. and Southern Dist. Asbestos Litigation*, 18 F.3d 126 (2ndCir.1994)(applying New York law); *Harvey v. Essex Bancorp, Inc.*, 25 Mass. App.Ct. 323, 517 N.E.2d 1300 (1988). Prejudgment interest in tort cases has been described as compensation for defendant's use of money to which the plaintiff was entitled from the time the claim accrues until judgment is rendered. *Burwell v. Oklahoma Farm Bureau Mut. Ins. Co.*, 896 P.2d 1195, 1199 (1995). These courts contend that excluding the settlement amount removes any incentive for joint tortfeasors to settle in a timely way if they know they are relieved of the obligation to pay interest on damages paid by other settling tortfeasors. *Harvey*, 517 N.E.2d at 1302.

[¶ 50.] It is imperative to note, however, that of the courts which favor the inclusion of the settlement amount in the calculation of prejudgment interest, some formula is applied to prevent a double recovery by the plaintiff, who would otherwise have the use of the settlement money and then collect interest on it. The Alaska Supreme Court created the first such formula in *American National Watermattress Corp. v. Manville*, 642 P.2d 1330 (Alaska 1982).

[¶ 51.] In *Manville*, the Alaska Supreme Court reversed a trial court's computation of interest in which the lower court deducted a $60,000 settlement from the judgment before computing prejudgment interest. Manville brought suit against a waterbed manufacturer for injuries she sustained when she was pinned beneath the bed after it rolled off its pedestal. Prior to trial, Manville received a $60,000 settlement from the retailer. The jury awarded $146,715 in damages against the manufacturer. The trial court deducted the $60,000 settlement from the judg-

ment before computing prejudgment interest. The Supreme Court reversed, finding this method unfairly deprived her of her prejudgment interest from the date of injury until the date of settlement. The court also rejected Manville's proposed computation which would have awarded her prejudgment interest on the entire sum. The court found that this method would amount to a windfall recovery as she would receive interest on the $60,000 settlement from the date of settlement to the date of judgment when she was not actually deprived of the use of the money during that period. *Manville*, 642 P.2d at 1344. The court determined that the correct answer could be found somewhere between the contentions of the parties and held that the $60,000 settlement should be treated as a payment on the final judgment with the $60,000 itself containing both prejudgment interest and principal. The court then created an algebraic formula to compute these sums and the correct amount of interest.

[¶ 52.] Many courts have created formulas to insure that plaintiffs receive the amount that will make them whole without a double recovery. For examples of different approaches *see Woolard v. JLG Industries, Inc.*, 210 F.3d 1158 (10thCir.2000); *Ramadanis v. Stupak*, 107 Nev. 22, 805 P.2d 65 (1991); *Brown v. Flowe*, 349 N.C. 520, 507 S.E.2d 894 (N.C. 1998); *See also* Arlyn H. Weeks, *The Unsettling Effect Of Maine Law On Settlement In Cases Involving Multiple Tortfeasors*, 48 MeLRev 77 (1996); Brittany L. Wills, *To Settle Or Not To Settle & The Calculation Of Judgments Among Non-Settling Defendants In Texas*, 31 StMary's LJ 529 (2000).

[¶ 53.] We adopt the approach utilized by the California Court of Appeals in *Newby v. Vroman*, 11 Cal.App.4th 283, 14 Cal. Rptr.2d 44 (1992).

[¶ 54.] We hold that the appropriate method for calculating prejudgment interest on a settlement received prior to judgment from a joint tortfeasor requires the following steps:

1. the prejudgment interest is first calculated on the final judgment without deducting an off-set for amounts paid by a settling joint tortfeasor,

2. the plaintiff may then recover from the nonsettling defendants the prejudgment interest up to the date of settlement on the total judgment,

3. the plaintiff may receive prejudgment interest after the date of settlement from the nonsettling defendants only on the balance of the total judgment remaining after it is reduced by the settlement amount.

*See Newby*, 14 Cal.Rptr.2d at 47.

[¶ 55.] This method maximizes a plaintiffs recovery for injury, to the extent the negligence or fault of others contributed to it, from the date of injury to settlement. *Id.* at 48 (citing *Franck v. Polaris E–Z Go Div. of Textron, Inc.*, 157 Cal.App.3d 1107, 204 Cal.Rptr. 321, 326 (1984)). It also prevents plaintiffs from being doubly compensated by receiving the use of the settlement funds and thereafter receiving prejudgment interest from the nonsettling tortfeasors for funds already in the possession of the plaintiff.

[¶ 56.] The trial court resolved the question of prejudgment interest without resorting to the application of a formula because the date of the settlement, May 18, 2003, was just a few days prior to the verdict rendered on May 21, 2003. The parties stipulated that the date of Setliff's loss was April 21, 1998. The court awarded prejudgment interest on the entire sum of $260,000. Upon remand, the difference between the interest calculation made by the trial court and the method now estab-

lished by this Court will be negligible. This Court, however, in order to provide direction to the bench and bar, addresses this issue on the merits to give litigants advance knowledge of the effect of their settlements in cases involving multiple tortfeasors. Thus, we remand to the trial court for application of this formula.

## ISSUE FOUR

[¶ 57.] **Whether the trial court erred by not enforcing SDCL 15–30–16.**

[¶ 58.] Stewart moved for dismissal of this case, alleging that Setliff failed to timely prosecute his claim pursuant to SDCL 15–30–16 within one year of this Court's decision on *Setliff I,* rendered September 6, 2000. Shortly after remand Setliff and the Clinic went into Chapter 11 bankruptcy reorganization. The trial court denied the motion and Stewart claims the trial court abused its discretion by finding the bankruptcy proceedings constituted good cause for the delay.

[¶ 59.] The standard of review of a trial court's denial of a motion to dismiss for failure to prosecute is abuse of discretion. *London v. Adams,* 1998 SD 41, ¶ 12, 578 N.W.2d 145, 148. We will uphold the decision if " 'in view of the law and the circumstances' " it was reasonably made. *Id.* (citation omitted).

[¶ 60.] SDCL 15–30–16 provides:

In every case on appeal, in which the Supreme Court shall order a new trial or further proceedings in the court below, the record shall be transmitted to such court and proceedings had therein within one year from the date of such order in the Supreme Court, or in default thereof, the action shall be dismissed, unless upon good cause shown the court shall otherwise order.

[¶ 61.] In *Sears v. McKee,* 326 N.W.2d 107, 108–109 (S.D.1982) the Court had occasion to interpret this statute stating:

Under SDCL 15–30–16, *Chapman [v. Hill] supra*[39 S.D. 58, 162 N.W. 931 (1917)], *Rex Buggy Co. v. Dinneen,* 28 S.D. 640, 134 N.W. 814 (1912), *Meadows v. Osterkamp,* 23 S.D. 462, 122 N.W. 419 (1909), and *Root v. Sweeney,* 17 S.D. 179, 95 N.W. 916 (1903), even though proceedings are not had within a year, the trial court may nevertheless deny a motion to dismiss for good cause shown. Under the cases above cited, good cause is evidenced by an agreement admissible under SDCL 16–18–11, fraud, accident, mistake, or some extraordinary circumstance for which the plaintiff is not responsible.

\* \* \*

. . . SDCL 15–30–16 and the above-cited cases make no allowance for any concept favoring a litigation of claims on the merits. The consideration of the trial court is limited to two specific issues: were there proceedings and, if not, was there good cause for delay.

[¶ 62.] In *White Eagle v. City of Fort Pierre,* 2002 SD 68, ¶ 14, 647 N.W.2d 716 we held that for purposes of SDCL 15–30–16 the clock begins to run from the opinion's decision date. Clearly proceedings were not held within one year from the date *Setliff I* was decided on September 6, 2000 as the trial commenced on May 19, 2003. The remaining issue is whether the trial court erred in finding good cause for the delay. In determining what constitutes good cause for delay, it is instructive to examine the guiding principles for review of a trial court's ruling on a dismissal for failure to timely prosecute pursuant to SDCL 15–6–41(b) [6] and SDCL 15–11–11.[7]

---

6. SDCL 15–6–41(b) states:

For failure of the plaintiff to prosecute or to

[¶ 63.] In *Swenson v. Sanborn County Farmers Union Oil Co.*, 1999 SD 61, ¶ 10, 594 N.W.2d 339, 342–343 (quoting *Dakota Cheese, Inc. v. Taylor*, 525 N.W.2d 713, 715–16 (S.D.1995)), the Court stated:

First, this Court ordinarily will not interfere with the trial court's rulings in these matters.

Second, a dismissal of an action for failure to prosecute is an extreme remedy and should be used only when there is an unreasonable and unexplained delay. An unreasonable and unexplained delay has been defined as an omission to do something "which the party might do and might reasonably be expected to do towards vindication or enforcement of his rights."

Third, the mere passage of time is not the proper test to determine whether the delay in prosecution warrants dismissal.

Fourth, the plaintiff has the burden to proceed with the action. The defendant need only meet the plaintiff step by step.

Finally, dismissal of the cause of action for failure to prosecute should be granted when, after considering all the facts and circumstances of the case, the plaintiff can be charged with lack of due diligence in failing to proceed with reasonable promptitude. (citations omitted).

[¶ 64.] *Setliff I* was decided on September 6, 2000 and remitted to the trial court on September 28, 2000. Just over four months later, on February 9, 2001, the Clinic filed a Chapter 11 bankruptcy in United States District Court. On February 21, 2001, Setliff filed a second bankruptcy petition in his personal capacity. Consequently, an automatic stay was in place per 11 USC § 362 until completion and approval of his reorganization plans. Setliff's business plan was confirmed in May 2002 and his personal plan was completed on September 17, 2002.

[¶ 65.] Setliff's bankruptcy attorney advised him not to schedule his civil case for trial during this process as it was necessary to preserve all of the resources of his estate to successfully restructure and avoid a Chapter 7 liquidation. Further, even if Setliff attempted to advance his case, Akins and Stewart would have been unable to defend and bring their counterclaims and claims for costs against Setliff. *See Farley v. Henson*, 2 F.3d 273

comply with this chapter or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in § 15–6–52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this section and any dismissal not provided for in § 15–6–41, other than a dismissal for lack of jurisdiction, or for failure to join a party under § 15–6–19, operates as an adjudication upon the merits.

7. SDCL 15–11–11 states:

The court may dismiss any civil case for want of prosecution upon written notice to counsel of record where the record reflects that there has been no activity for one year, unless good cause is shown to the contrary. The term "record," for purposes of establishing good cause, shall include, but not by way of limitation, settlement negotiations between the parties or their counsel, formal or informal discovery proceedings, the exchange of any pleadings, and written evidence of agreements between the parties or counsel which justifiably result in delays in prosecution.

(8thCir.1993); *Koolik v. Markowitz,* 40 F.3d 567 (2nd Cir.1994).

[¶ 66.] Setliff's delay does not appear to be from a lack of due diligence or for a lengthy period of time. Good cause for delay is determined on a case by case basis. Dismissal will be granted when the facts establish unjustifiable delays. *See, e.g., White Eagle v. City of Fort Pierre,* 2002 SD 68 at ¶ 11, 647 N.W.2d at 720 (permitting a case to remain idle for years without a single confirmable activity demonstrates a lack of diligence); *Du–Al Mfg. Co. v. Sioux Falls Const. Co.,* 444 N.W.2d 55 (S.D.1989)(trial court did not abuse its discretion in dismissing case where record showed total unexplained lack of activity for 12 years and ten months); *Holmoe v. Reuss,* 403 N.W.2d 30, 32 (S.D.1987)(no abuse of discretion in dismissing case in which plaintiffs' unexplained inactivity exceeded three years).

[¶ 67.] Many courts have found that filing a bankruptcy petition, in and of itself, constitutes good cause for delay in advancing a case toward trial. *Gadinsky v. Bruno,* 695 So.2d 867 (Fla.Dist.Ct.App.1997); *Bowman v. Peele,* 413 So.2d 90 (Fla.Dist. Ct.App.1982) (if an action is stayed as to one or more of the parties either by court order or by automatic stay invoked because of federal Bankruptcy Act, it will not be dismissed for failure to prosecute); *Dorich v. DiBacco,* 440 Pa.Super. 581, 656 A.2d 522 (1995); *Matusow v. Zieger,* 702 A.2d 1126 (Pa.Cmwlt. 1997). In the present case, Setliff's case was tried eight months after the stay was lifted. The bankruptcy proceeding constituted good cause for the delay which was not excessive or unjustified. The trial court did not abuse its discretion in denying Stewart's motion to dismiss on the ground that the bankruptcy proceeding constituted good cause for delay.

[¶ 68.] We affirm the trial court's judgment except that part pertaining to prejudgment interest. We reverse the award of prejudgment interest and remand to the trial court for recalculation of the award in a manner consistent with this decision.

[¶ 69.] Affirmed in part, reversed in part and remanded.

[¶ 70.] SABERS, KONENKAMP and ZINTER, Justices, concur.

[¶ 71.] GILBERTSON, Chief Justice, dissents.

[¶ 72.] KERN, Circuit Judge, for MEIERHENRY, Justice, disqualified.

GILBERTSON, Chief Justice, (dissenting).

[¶ 73.] I respectfully dissent. In *Setliff v. Akins,* 2000 SD 124, 616 N.W.2d 878 (*Setliff I* ), Justice Amundson and I would have held there was no cause of action for civil conspiracy against Akins by Setliff. As Justice Amundson noted in his dissent in *Setliff I,* the record in that case did not reflect an underlying tort claim sufficient to support Setliff's civil conspiracy action. Given that there was no conspiracy between Akins and Stewart in *Setliff I,* there can be no conspiracy in the instant case as there is no one with whom Stewart could have conspired. *See United States v. Bell,* 651 F.2d 1255, 1258 (8th Cir.1981) (citing *United States v. Moss,* 591 F.2d 428, 434 (8th Cir.1979) (holding an individual cannot be convicted of conspiracy with himself)). That being the case, there is no legal basis to uphold the verdict against Stewart.