# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 22-2129
No. 22-2190

———————————————————

Venture Communications Cooperative, Inc.

*Plaintiff - Appellant/Cross Appellee*

v.

James Valley Cooperative Telephone Company; Northern Valley Communications, LLC

*Defendants - Appellees/Cross Appellants*

———————————

Appeals from United States District Court
for the District of South Dakota - Central

———————————

Submitted: February 14, 2023
Filed: July 6, 2023

———————————

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.

———————————

LOKEN, Circuit Judge.

The Federal Communications Commission (FCC) provides subsidies to encourage telecommunication companies to expand high-speed broadband internet services in rural areas where customer revenues would otherwise be insufficient to justify the cost of doing business. See generally AT&T, Inc. v. FCC, 886 F.3d 1236, 1241-44 (D.C. Cir. 2018). In determining the subsidy a carrier should receive, the

FCC excludes census block locations where an "unsubsidized competitor" provides sufficiently fast broadband speeds. The FCC identifies census blocks disqualified by the presence of an unsubsidized competitor based on its FCC Form 477, a local competition and broadband reporting form that each provider submits semiannually. Form 477 "provide[s] the Commission with uniform and reliable data not comprehensively available elsewhere." In the Matter of Modernizing the FCC Form 477 Data Program, 28 FCC Rcd. 9887, 9889 (June 27, 2013).

Venture Communications Cooperative ("Venture") provides broadband services[1] to rural South Dakota customers. James Valley Cooperative Telephone Company and its wholly owned subsidiary, Northern Valley Communications (collectively, "Northern Valley"), is a competing provider. Venture filed this lawsuit against Northern Valley in April 2020. The primary claim is that Northern Valley violated 47 U.S.C. § 220(e) by filing a Form 477 that "intentionally, deliberately, fraudulently, and maliciously misrepresent[ed]" information "for the sole unlawful purpose of harming [Venture]" by depriving Venture of FCC subsidies in census blocks where Northern Valley was deemed to be an unsubsidized competitor.[2] For violations of § 220(e), 47 U.S.C. §§ 206 and 207 provide a private right of action to recover damages. Venture claims it is losing $1,268,370 of subsidies each year. It also asserted state law claims for tortious interference, fraud, unfair competition, and civil conspiracy.

---

[1]Broadband is high-speed internet, not available by dial-up. It can be provided by fiber optic cable, wireless, satellite, digital subscriber line, or a cable modem.

[2]Section 220(a) provides that the FCC may "prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to this chapter." Section 220(e) makes it a misdemeanor for any person to "willfully make any false entry in the accounts . . . or in any record or memoranda kept by any such carrier." Here, James Groft, Northern Valley's CEO, certified that all information in the Form 477 at issue was accurate.

After dismissing the fraud and unfair competition claims, the district court[3] granted Northern Valley summary judgment, concluding "there is no evidence that Northern Valley willfully overreported its broadband capabilities." The court dismissed the tortious interference claim because Northern Valley committed no "intentional and unjustified act of interference" and the civil conspiracy claim for lack of an underlying tort. Venture appeals the grant of summary judgment. Reviewing *de novo*, we affirm. See <u>MCC Iowa, LLC v. City of Iowa City</u>, 887 F.3d 370, 372 (8th Cir. 2018) (standard of review).

A. In the American Recovery and Reinvestment Act of 2009, Congress charged the FCC with developing a National Broadband Plan "to ensure that all people of the United States have access to broadband capability and [to] establish benchmarks for meeting that goal." Pub. L. No. 111-5, § 6001(k), 123 Stat. 115, 515-16 (2009). The FCC's National Broadband Plan, submitted to Congress in March 2010, estimated that 14 million people did not then have access to terrestrial broadband infrastructure capable of meeting the agency's target capability, creating a "broadband availability gap." In 2011, the FCC established the Connect America Fund (CAF) to provide funding that would bridge this gap in unserved areas. <u>See generally</u> <u>In re FCC 11-161</u>, 753 F.3d 1015, 1038-40 (10 Cir. 2014).[4]

The FCC uses the Alternative Connect America Cost Model (A-CAM) to determine CAF support for a particular broadband provider. Venture was excluded from A-CAM I funding in areas where it deployed fiber optic cable, an exclusion

---

[3]The Honorable Roberto A. Lange, Chief Judge of the United States District Court for the District of South Dakota.

[4]The CAF is one of four programs within the Universal Service Fund established by the FCC to implement the principle of universal access to communication services. It is funded by contributions from telecommunications providers based on their end-user revenues. <u>See</u> 47 U.S.C. § 254(d)-(e); <u>Tri-Cnty. Tel. Ass'n, Inc. v. FCC</u>, 999 F.3d 714, 717 (D.C. Cir. 2021).

eliminated in A-CAM II, which began in March 2018. But A-CAM II excludes census blocks where an unsubsidized competitor offers broadband speeds of at least 25/3 Mbps, a determination based on the competitor's Form 477 filings.[5]

B. On July 1, 2017, Northern Valley acquired the assets and customers of Northern Wireless, an unsubsidized broadband provider competing with Venture in 525 census blocks in South Dakota (the "Overlap Area"). In its last Form 477 before being acquired, Northern Wireless reported broadband speeds as high as 70/8 Mbps in some census blocks. In its first post-acquisition December 2017 Form 477 filing, Northern Valley reported broadband speeds of 25/3 Mbps in the Overlap Area, speeds that would disqualify Venture from A-CAM II subsidies in those 525 census blocks. Worried that Venture would be excluded from funding, Venture consultant John Kuykendall wrote the FCC in April 2019, referencing Northern Valley's reported speeds of 25/3 Mbps and urging adoption of an A-CAM II challenge process to allow affected broadband carriers to correct erroneous information. Kuykendall also e-mailed CEO James Groft, asking that Northern Valley file a corrective letter advising the FCC that it did not provide 25/3 Mbps speeds in the Overlap Area.

On May 2, the FCC announced the A-CAM II grants, giving Venture $10,379,546 annually for the ten-year period but no funding for census blocks in the Overlap Area. Four days later, Kuykendall e-mailed Groft, including a draft correction letter Kuykendall urged Northern Valley to file with the FCC. Groft refused, explaining Northern Valley cannot submit a letter saying it has not deployed that level of broadband service "because it is not accurate," referring to Northern Valley's purchase of Northern Wireless's network. Groft did, however, sign a

---

[5]Broadband speeds are measured in megabytes per second ("Mbps"), written as a fraction. The numerator is the speed at which a user can download information per second and the denominator is the speed at which a user can upload information per second. Higher numbers indicate higher quality (downloading 25 megabytes per second is faster than downloading 10 megabytes per second, the A-CAM I standard).

modified letter to the FCC stating that Northern Valley did not provide voice service in the Overlap Area and asking the FCC to revise the A-CAM II grants accordingly. On June 5, the FCC issued A-CAM II program modifications but did not include the correction Northern Valley requested.[6] On June 12, Venture accepted its A-CAM II grant. This lawsuit followed.

C. In the summary judgment proceedings, Tanya Berndt, CFO of Northern Valley, testified that, in preparing Northern Valley's December 2017 Form 477 filing, she relied on Northern Wireless's prior Form 477 that reported speeds of 70/8 Mbps. Berndt also confirmed that Northern Wireless had billed customers for speeds over 25/3 Mbps. She reduced the speeds Northern Valley reported to 25/3 Mbps because Northern Valley did not advertise 70/8 Mbps.

Venture presented reports by its expert, Dominic Villecco, who performed a "coverage analysis" of Northern Valley's broadband network and determined that, in 341 census blocks in the Overlap Area, Northern Valley could not provide 25/3 Mbps to at least one household. Venture argued this created a material issue of fact precluding the grant of summary judgment -- whether the maximum advertised speed claimed by Northern Valley was "available" to at least one end user in the Overlap Area census blocks.

The district court concluded Villecco's report did not create a genuine issue of material fact regarding whether Northern Valley *willfully* violated 47 U.S.C. § 220(e) in its December 2017 Form 477 filing:

> It is undisputed that [Northern Valley] provided broadband services in the Overlap Area after acquiring [Northern Wireless]. It is also

---

[6]This was likely because the FCC counts a broadband provider as providing voice service in a census block so long as it provides voice services *somewhere* in the State, which Northern Valley did. Voice service is not an issue on appeal.

undisputed that the FCC requires broadband providers to report maximum advertised speeds, and [Northern Valley] advertised speeds of at least 25/3 Mbps as [it] reported in its 2017 Form 477.

* * * * *

Although a broadband provider need not prove the actual speeds it offers by census block to comply with the Telecommunications Act, Northern Valley believed that it offered broadband speeds of 25/3 Mbps or higher in the Overlap Area based on information from [Northern Wireless] during the acquisition, including information that [Northern Wireless] reported providing broadband speeds of 70/8 Mbps and 25/3 Mbps in its 2017 Form 477.

The court rejected the claim that Northern Valley's actions were motivated by pure animus, noting the email exchange between Kuykendall and Groft in which Groft agreed to assist Venture in its correspondence with the FCC, and Northern Valley's genuine belief that it offered the advertised 25/3 broadband speeds after acquiring Northern Wireless.

On appeal, Venture argues the district court erred in granting summary judgment dismissing its § 220(e) claim because Northern Valley certified broadband service based solely on the service it advertised, knowing (i) it was required to report service it both advertised *and* could make available, and (ii) it could not make the service it advertised available in hundreds of census tracts being reported. Northern Valley argues (i) it accurately reported its broadband coverage based on advertised speeds, as the FCC required, and (ii) Venture failed to create a disputed issue of fact whether Northern Valley willfully submitted a false Form 477.[7] We have carefully

_____

[7]Northern Valley also renews its assertion that the district court erred in assuming subject matter jurisdiction because (i) 47 U.S.C. § 207 allowed Venture to either make a complaint to the FCC or bring suit in district court, but not both; (ii) Venture repeatedly complained to the FCC about Northern Valley's allegedly false Form 477 filings; (iii) the FCC rejected this informal complaint and made an

reviewed these complex FCC reporting requirements that have rather rapidly evolved as the agency gained more experience in regulating broadband internet providers in a now-competitive telecommunications market. We agree with the district court.

D. Of critical importance to resolving this legal issue are the FCC's instructions to providers such as Northern Valley regarding how to report broadband internet speeds on a Form 477 filed in 2017. The published FCC Instructions for Forms 477 filed through June 30, 2019 told telecommunication companies providing fixed broadband connections to consumer end users to report a list "of all census blocks in which the filer . . . makes broadband connections available to end-user premises," and "the maximum upload and download speeds . . . as specified in a separate document, How Should I Format My Fixed Broadband Deployment Data?"[8] This separate document instructed filers to list the "maximum *advertised* downstream bandwidth *available* in the census block in Mbps" and "the maximum *advertised* upstream bandwidth that is offered with the above maximum advertised downstream bandwidth *available* in the census block" (emphasis added). The Glossary section of the Form 477 Instructions defined these important terms:

---

unfavorable A-CAM II ruling; and (iv) the Hobbs Act bars district courts from issuing orders to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342(1). We agree with the district court that this is a question of statutory jurisdiction, "not the type of jurisdictional issue that must be decided before addressing the merits of the controversy." Lukowski v. I.N.S., 279 F.3d 644, 647 n.1 (8th Cir. 2002); cf. Butcher v. Wendt, 975 F.3d 236, 242-44 (2d Cir. 2020).

[8]FCC Form 477 Local Telephone Competition and Broadband Reporting Instructions for Filings Through June 30, 2019 at 16, OMB Control No. 3060-0816 (2019) https://us-fcc.app.box.com/v/Form477InstThruJune19 (hereafter "Form 477 Instructions"). The separate document is found at https://us-fcc.app.box.com/v/FBDFormattingThruJune19.

-7-

**Advertised speeds:** For purposes of this form, the terms "advertised speeds" or "advertised bandwidths" are to be distinguished from . . . engineering-based concepts that do not represent the downstream and upstream bandwidths that the end user reasonably may expect to receive. . . . Among other methods, a service is "advertised" to the end user when it is described at point of sale or when the end user is charged at a rate associated with a particular grade of service in the end user's area.

**Available:** For purposes of this form, fixed broadband connections are available in a census block if the provider does, or could . . . without an extraordinary commitment of resources -- provision two-way data transmission to and from the Internet with advertised speeds exceeding 200 kbps in at least one direction to end-user premises in the census block.

Form 477 Instructions at 33.

The FCC's focus on advertised speeds rather than speeds actually delivered was explained in its June 27, 2013 Order "modernizing" the Form 477 Data Program:

The Commission currently collects data on advertised speeds. The Commission sought comment on whether . . . for example, providers should provide information about actual speeds . . . . We conclude that it is not appropriate or feasible to collect actual speed information from broadband providers via Form 477. Many commenters expressed concern because there is no way for providers to report actual speed information in a meaningful way. Commenters explain that the collection of these data is a highly complex, time consuming, and expensive undertaking that requires the use of specialized equipment in the providers' networks and at their customers' premises. As the Commission found in 2008, "the record of this proceeding does not identify a methodology or practice that could be applied, consistently and by all types of broadband filers, to measure the information transfer rates actually observed by end users." We continue to believe that conclusion is correct.

28 FCC Rcd. at 9906-07.  The district court concluded it is undisputed that Northern Valley in fact "advertised speeds of at least 25/3 Mbps as [it] reported in its 2017 Form 477."

E. On appeal, Venture argues the district court erred by ignoring the definition of "available" in the Form 477 Instructions Glossary -- "fixed broadband connections are available in a census block if the provider does, or could . . . without an extraordinary commitment of resources -- provision two-way data transmission to and from the Internet."  Venture posits that expert Villecco's opinion that Northern Valley could not make its maximum advertised speed of 25/3 Mbps available to even one household in 341 of the 525 census blocks in the Overlap Area creates a genuine issue of material fact on this issue and precludes summary judgment.

We reject Venture's argument for a number of related reasons.  First, the definition in the 2017 Form 477 Instructions Glossary states that service is "available in a census block if the provider does, or could . . . provision two-way data transmission . . . with advertised speeds *exceeding 200 kbps* . . . to end-user premises in the census block."  Form 477 Instructions at 17, 33 (emphasis added).[9]  In other words, Northern Valley could report advertised bandwidths of 25/3 Mbps only if it could actually provide at least 200 kbps to households in the census block, a much slower speed.  Venture's expert reported only that Northern Valley could not make its maximum advertised speed of 25/3 Mbps available to at least one household in 341 census blocks.  As the FCC does not require providers to report information about actual speeds delivered, Villecco's report was not evidence establishing that

[9]Venture relies in part on somewhat different wording in the Background section of a 2017 FCC Further Notice of Proposed Rulemaking that invited comment on the Form 477 process.  See In the Matter of Modernizing the FCC Form 477 Data Program, Further Notice of Proposed Rulemaking, 32 FCC Rcd. 6329, 6330 (Aug. 4, 2017).  A notice of proposed rulemaking does not supersede or modify the 2017 Form 477 Instructions on which the district court relied.  Indeed, the notice explicitly referred to the FCC's existing "availability" definition.  Id. at 6339.

Northern Valley, reporting broadband service acquired from Northern Wireless, filed a willfully false Form 477.

Second, CFO Berndt of Northern Valley testified that, in preparing the December 2017 Form 477 at issue, she relied on Northern Wireless's prior Form 477 that reported advertised speeds of 70/8 Mbps and confirmed that Northern Wireless had billed customers for speeds over 25/3 Mbps. This was affirmative evidence that Northern Valley reported advertised speeds that were in fact available in the Overlap Area. The FCC did not require Northern Valley to collect data on actual speeds delivered to end-user premises, a highly complex, time consuming, and expensive undertaking.

Third, we agree with the district court that Venture presented no evidence that Northern Valley willfully made a false Form 477 entry regarding its broadband capabilities that would support a private right of action for damages under 47 U.S.C. §§ 206, 207, and 220(e). Northern Valley reported maximum advertised speeds in the Overlap Area based on Northern Wireless operations as previously reported to the FCC. Though Venture argues Northern Valley misinterpreted the Form 477 Instructions, it cites no FCC order or judicial interpretation that even arguably, much less clearly, supports Venture's strained interpretation of how the FCC required that advertised speeds availability be determined and reported. Venture made no showing of intentional impropriety in Northern Valley's record-keeping practices. See Hoffman v. Rashid, 388 F. App'x 121, 123 (3d Cir. 2010).

In response, Venture argues that its allegations of Northern Valley's "history of ill will and hostility towards Venture and its CEO," and Northern Valley's "history of manipulating Form 477 data" during the A-CAM I period, make its willful intent to injure Venture a material disputed issue of fact. But these general allegations of ill will are not evidence of willful intent to injure *in this case*. As the district court noted, Venture's claim of intent to injure is belied by Northern Valley helping

Venture by filing a letter with the FCC clarifying that Northern Valley did not offer voice service in the Overlap Area.

For these reasons, we conclude the district court correctly granted summary judgment dismissing Venture's Telecommunications Act claims.

F. We likewise affirm the dismissal of Venture's tortious interference and civil conspiracy claims under South Dakota law. Tortious interference with a business relationship or expectancy requires "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damages to the party whose relationship or expectancy was disrupted." Selle v. Tozser, 786 N.W.2d 748, 753 (S.D. 2010) (cleaned up). We agree with the district court that Venture proffered no evidence of an "intentional and unjustified act of interference" because Northern Valley complied with all FCC reporting requirements.

Under South Dakota law, a claim of civil conspiracy requires proof that two or more persons committed one or more unlawful overt acts that proximately caused the damages claimed. See Reuben C. Setliff, III, M.D., P.C. v. Stewart, 694 N.W.2d 859, 866-67 (S.D. 2005). Civil conspiracy is "not an independent cause of action," but rather is "sustainable only after an underlying tort claim has been established." Yankton Cnty. v. McAllister, 977 N.W.2d 327, 341 (S.D. 2022) (quotation omitted). As Northern Valley complied with the Telecommunications Act in filing the Form 477 at issue, there is no plausible underlying tort alleged. Summary judgment is warranted on this claim.

The judgment of the district court is affirmed.

_____